See also, 200 F.Supp. 59.

**WILLRED COMPANY (a corporation)**
and
**Professional Metal Manufacturing Company (a corporation)**
and
**William V. Bliwise and Ellen Bliwise**
and
**Albert Bliwise**
v.
**WESTMORELAND METAL MFG. CO., (a corporation).**
Civ. A. No. 21177.

United States District Court
E. D. Pennsylvania.
May 4, 1959.

**56**

A. Evans Kephart, Stassen, Kephart, Sarkis & Scullin, Philadelphia, Pa., for plaintiffs.

Samuel Rosenberg, Marvin Comisky, Louis D. Apothaker, Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

In this action, tried to the Court without a jury [1], the plaintiff [2] claims damages on two counts (1) breach of an exclusive distributorship contract and (2) late and defective deliveries of merchandise under the contract.

The defenses are (1) that no enforceable contract resulted from the negotiations between the parties, (2) that the plaintiff rather than the defendant breached the contract or, perhaps, rescinded it, and (3) that, so far as the defendant was responsible for defects in the merchandise, that item, along with the plaintiff's entire claim arising out of certain New York contracts, was settled by an accord and satisfaction.

Both parties (the plaintiff through an affiliate) were in the business of manufacturing school furniture and they were competitors in that field. In March 1955 [3] there was a meeting between representatives of the two companies the purpose of which was to work out an arrangement which would be to their mutual advantage by eliminating competition between them. Westmoreland had begun the manufacture of school furniture and Willred, in addition to being a manufacturer, was an experienced sales outfit and, at the time of the meeting, held two contracts with the New York school authorities (one for 1954 which remained unfinished and the other for 1955 which had just been awarded) and a smaller contract with Baltimore.

A contract was entered into at the meeting, complete agreement having been reached upon the following points: [4]

(1) Willred was to discontinue manufacturing school furniture and would sell Westmoreland any of its manufacturing equipment which the latter might have use for, at a reasonable price to be subsequently fixed by agreement.

(2) Westmoreland agreed to manufacture and deliver to Willred school furniture to fulfill the two New York contracts and the Baltimore contract and also any future contracts awarded to Willred by any school authorities, subject to certain definitely fixed territorial and quantity limitations, and Willred agreed that it would order furniture from Westmoreland, would make delivery of it to the school involved and would not do business with any other manufacturer of school furniture.

(3) The matter of prices was settled and the prices which Willred was to pay Westmoreland for desks to be supplied under the three existing contracts were specifically agreed upon. In addition, a definite and workable formula, the main feature of which was an 8% discount to Willred on top of the regular 20% trade

---

1. When the case was called for trial the Court, in pursuance of an agreement by the parties, ordered a separate trial of the issue of liability, the issue of damages being postponed to a later date.

2. As a matter of record, the amended complaint lists four plaintiffs in addition to Willred. For the purposes of this discussion, it is unnecessary to differentiate between them.

3. The testimony leaves it uncertain whether the meeting was on the 14th or 19th, but the exact day is of no importance.

4. What follows is a summary of the terms of the agreement. It is set forth in detail in the plaintiff's 23rd request for finding of fact, which request I affirm and adopt.

discount, was also agreed upon for all future contracts which Willred might obtain in the area of its distributorship.

(4) Willred was to supply the wood parts, desk tops, chair seats, etc., the cost of same to be deducted from Westmoreland's billing to Willred.

(5) The parties agreed to share equally the cost of a 2% commission upon contracts obtained by Willred which would be paid to Westmoreland's dealers in areas in which it had dealers.

(6) The agreement was to be effective until December 31, 1957, and thereafter terminable by either party on six months notice.

The defendant's witnesses deny that any agreement at all was arrived at upon many of the foregoing matters but I accept the version of the plaintiff's witnesses and find that an agreement substantially in the terms stated above was arrived at.

The defendant further contends that even if such agreement was made it is unenforceable for two reasons (1) because indefinite as to price and as to Willred's obligation to purchase any specific quantity of merchandise or to endeavor to promote the sale of the products and (2) because the parties had under consideration the reduction of the agreement to writing at some future time, which was never done.

■ The defendant's first contention would have more force if the contract here was an ordinary contract for the sale of goods. However, as pointed out in Laveson v. Warner Mfg. Corp., D.C., 117 F.Supp. 124, there are important differences, particularly as to the element of price, between ordinary contracts of sale and sales agency, or distributorship, contracts. In the latter the parties are primarily interested not in what is to be obtained in a single transaction but in a substantial volume of sales in the future with changing conditions to be met. I do not think that the contract in this case is so indefinite and uncertain as to be unenforceable as a matter of law. As a matter of fact there never was any dispute which could be attributed to any indefiniteness of terms between the parties, who apparently were perfectly able to conduct their business under it. The breach alleged is a breach of the exclusive feature as to which particular term there could be no question of indefiniteness.

■ As to the matter of reduction to writing, the law is well settled that the mere fact that such reduction is contemplated does not render an oral contract unenforceable. The whole question is whether the parties intended to be bound by the contract as orally agreed to, contemplating a writing merely as a memorial thereof. The parties in the present case, without waiting for any writing, proceeded immediately to put into effect the terms of their contract and did business under it for almost a year. The case is not one in which the parties were exchanging draft agreements each one suggesting changes—a circumstance from which it has frequently been inferred that the intention to be bound depended upon the execution of a written agreement. I find that, in this case, the mutual intention was that the oral agreement would be binding as of the day it was made.

Promptly after the meeting of March 1955, Willred discontinued its manufacturing business and shortly thereafter Westmoreland took such of the machinery and equipment as it needed, there being no difficulty about the price. Willred, from time to time and as it needed the merchandise for delivery to the school authorities, issued purchase orders to Westmoreland. The prices in dollars and cents for the chairs, which had not been determined in the March meeting, were agreed upon very shortly thereafter. Willred further submitted a number of bids after consultation with Westmoreland for other school contracts and was successful in obtaining one.

The furniture delivered was in many instances defective, requiring repairs to be made upon it by Willred.

Both parties knew that the next New York contract would be awarded in late February 1956. This was by far the largest contract for school furniture that would be bid upon. In January samples of Westmoreland's product were delivered to Willred to be submitted by the latter to the New York Board of Education. On February 14 the parties met to discuss, among other things, the prices which Willred would bid on the New York contract and the meeting adjourned, with Westmoreland intending to review its costs and to give Willred a final price for the bid on February 17.

On the 17th of February, Westmoreland notified Willred that it, Westmoreland, had discovered that it had an exclusive distributorship arrangement in New York with another firm and that Willred could not submit a bid for the New York contract on furniture manufactured by Westmoreland. Willred found another manufacturer who would manufacture for it, submitted a bid and obtained a part of the New York contract for furniture to be supplied by the other manufacturer. Thereafter Willred obtained all of its furniture from the new source, including the balance of the furniture on the contracts it held with New York.

Westmoreland, in making it impossible for Willred to bid on Westmoreland furniture for the New York contract and in putting its other distributor in a position to bid, clearly breached its contract with Willred. The breach was a material one and justified Willred in treating its obligations under the contract as discharged. The New York school contracts really constituted the heart of the whole distributorship arrangement, the remaining business being comparatively unimportant.

The defendant's contention that, if there was any enforceable agreement Willred had already breached it by failing to place purchase orders with it after November 21, is without merit. The distributorship agreement did not bind Willred to place its orders with

Westmoreland at any particular time. The conditions of the New York contracts were well known to both parties. It was understood that furniture called for by them was to be supplied, not at any specific time, but when and as ordered by the New York Board of Education. On November 21, 1955, Westmoreland had delivered to Willred more furniture than Willred had ordered and more furniture than was required as of that date by New York. I find that Willred did not breach the contract by failing to issue purchase orders and it is not even suggested that it breached it by placing orders with any manufacturers other than Westmoreland.

The defendant's contention that Willred waived the breach of the contract (referred to as "rescission" in the briefs) is equally without merit. It stems from a remark made by Willred's president, when he learned of Westmoreland's refusal to allow him to bid, to the effect that "I guess from now on we will be competitors". The defendant attempts to give plausibility to its argument for rescission by the fact that Willred did not instantly sever all relations with Westmoreland and treat all persons connected with it as mortal enemies. The law does not require such an extreme attitude on the part of one who has been subjected to a breach of contract. The fact that the parties continued to transact small items of business and to try to work out their accounts does not constitute a waiver of the breach.

This brings us to the second branch of the plaintiff's case, namely, the defendant's liability for damages. The issue of damages has not been tried as yet. However, the defense of accord and satisfaction was presented to the Court and should now be determined. On February 14, 1956, during the same conference at which prices for the pending New York contract were under discussion, the parties took up the matter of the defective furniture. The New York problem consisted of two parts. Willred anticipated that the Board of

Education would insist on taking a discount on the contract price as a condition of allowing the furniture to remain in the schools, this because Westmoreland's product was not only defective but because it also failed to conform to specifications in some particulars. The second part of the problem arose from the fact that Willred had been compelled to repair a lot of the furniture and to incur expense in doing so. Unquestionably an agreement was reached at the conference. The dispute between the parties is only as to its scope.

The defendant contends that the entire controversy about the furniture, including the claim for repairs, was settled by an agreement on its part to pay 75% of 7% (the anticipated discount) on Willred's sales price to New York. The plaintiff contends that the agreement covered only the discount and did not cover repairs. It avers that the defendant agreed to pay, in addition to 75% of the New York discount, 75% of the cost of the repairs to the furniture, labor to be charged at $1.35 an hour, plus 10%.

I accept the plaintiff's version of the agreement. On February 22, Westmoreland issued a credit memorandum for "Adjustment of billings to N. Y. City" covering 75% of the 7% New York discount. On the 23rd the defendant wrote a letter referring to the *repair costs* and stating "Upon completion of this work we shall review your charges and make settlement at that time". If the credit memorandum of February 22 was intended, as the defendant now contends, to cover the whole dispute, the writing of such a letter seems to me to be inexplicable. It is, however, entirely consistent with the plaintiff's version of the transaction.

Willred was given credit in its account with Westmoreland for 75% of 7% on its New York sales price, and as to that item, therefore, there was an accord and satisfaction. There was no satisfaction as to any other item of the plaintiff's claim upon which this action was brought.

In the foregoing opinion I have stated, and found, such facts as appear to me to be necessary in order to dispose of the issue of liability. The parties have presented numerous requests for findings of fact. These have been extremely helpful in calling my attention to everything in the case that has any bearing upon the issue before me and I have given them careful consideration, but I do not feel that it is necessary to answer them seriatim. The requests for conclusions of law contain many propositions which are correctly stated but which, so far as the facts as found in this case are concerned, have no application. Such of them as are applicable, I believe, have been fully covered by the discussion contained in the opinion.

Judgment may be entered in favor of the plaintiff upon the separate issue of liability.