**WILLRED COMPANY (a corporation)**
and
**Professional Metal Manufacturing Company (a corporation)**
and
**William V. Bliwise and Ellen Bliwise**
and
**Albert Bliwise**
v.
**WESTMORELAND METAL MFG. CO. (a corporation).**
**Civ. A. No. 21177.**

United States District Court
E. D. Pennsylvania.
Oct. 4, 1961

A. Evans Kephart, Stassen, Kephart, Sarkis & Scullin, Philadelphia, Pa., for plaintiff.

Marvin Comisky, Philadelphia, Pa., Samuel Rosenberg, Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

In this action, tried to the Court without a jury, the plaintiff claims damages on two counts, (1) breach of an exclusive distributorship contract and (2) late and defective deliveries of merchandise prior to the breach. The defendant having been found liable on both counts in a separate trial, the case is now before the Court for the assessment of damages. The facts bearing upon both breaches are fully set forth in the opinion of this Court filed May 4, 1959, 200 F.Supp. 55, and need not be repeated here.

 1. Damages for breach of the exclusive distributorship contract.

On February 17, 1956, the defendant without legal justification notified the plaintiff that it would no longer supply the plaintiff with furniture for the New York Board of Education (by far the largest buyer in the East), following which the defendant through a different sales agency obtained a large portion of the New York contracts for itself. The contract with Willred could have been terminated on notice by either party as of December 31, 1957.

The amount claimed by the plaintiff in this branch of its case is $443,268.30 which is mainly made up of the profit which it asserts would have been realized by it if the contract had been carried out. The defendant, although not admitting liability contends that the plaintiff's losses arising from the termination of the contract were nil.

The law is too well settled to admit of any dispute that lost profits may be the measure of damages provided the evidence establishes with reasonable certainty what the profits would have been had the contract not been breached. Restatement, Contracts, Sec. 331. Whether the evidence is sufficient to meet the re-

quirement of the rule is another matter, and the present case presents certain difficulties which are not usually encountered in cases of breach of similar contracts. In most of the reported cases, the breach resulted in the discontinuance of the plaintiff's business or of that part of his business to which the contract appertained.

■ The plaintiff in the present case, a sales organization having an established business extending over four years prior to the breach, not only continued in business after the breach but, having obtained another supplier, competed actively with the defendant and succeeded in getting a very substantial amount of business on which the defendant had bid both directly and through another sales organization. This situation, together with the fact that competition in the business is principally for large contracts awarded on sealed bids, presents such perplexing questions that a rather wide latitude should be accorded to the trier of facts in fixing damages if this plaintiff, unquestionably injured by the inexcusable repudiation of a contract, is not to be left without a remedy.

The problem involves two questions, (1) what volume of business could the plaintiff reasonably be expected to have done had the contract not been breached, and (2) what profit could the plaintiff have reasonably been expected to have made on such business?

■ To arrive at the volume of business which the plaintiff lost by reason of the breach, I accept the figure of $1,-759,512.75. This figure represents the business within the orbit of the contract obtained by the defendant after the breach.[1] After considering all the circumstances, I think it is a fair measure of the business of which the plaintiff was deprived by reason of the breach and which, had there been no breach, it could have obtained. (See Ross v. Houck, 184 Pa.Super. 448, 136 A.2d 160) This figure

eliminates the mark-up of 15% plus 5% which the plaintiff wished to add. It includes the price of round tables, kindergarten tables, dressing tables and stools for the New York contracts. These, I think, were within the scope of the original contract between the parties.

■ I cannot accept the defendant's contention that, under the decision of the Supreme Court of Pennsylvania in Lambert et al. v. Durallium Prod. Corp., 364 Pa. 284, 72 A.2d 66, profits on the contracts for school furniture which the plaintiff obtained following the breach and within the contract period must be an offset against the plaintiff's damages for profits lost. A significant difference between the facts of the Lambert case and the present one makes the rule of the former inapplicable here. In the Lambert case the plaintiff was a manufacturer, and, upon the breach, he merely changed the material used by him and continued to manufacture the same articles. The plaintiff produced no evidence to show that the change of the material affected the volume of his business in any way and there was nothing to show that, after the breach, he was not doing all the business he could do. Hence, there was no problem of restoring to the plaintiff the value of lost business. It was a simple matter to place him in the same position which he would have occupied had the contract not been breached, and he would be fully compensated by allowing him the difference between the profit on the business he did which he would have made with the defendant's material and that which he made with the substitute. Anything more would have been a windfall.

In the present case the plaintiff was engaged in selling only. It had no plant and there is nothing to show that the quantity it could sell was in any way limited by personnel considerations. The defendant was obligated to supply furniture to fill all contracts obtained by the

[1.] The figure is the money received by the defendant. The sales price to the boards does not appear. Therefore, the above figure would represent the cost to the plaintiff, which is a proper basis upon which to figure its profit.

plaintiff up to the capacity of its (the defendant's) plant. I am not satisfied that the defendant's capacity to produce was exhausted by the business it actually did but, on the contrary, I believe that, had it been called upon to fill the orders which the plaintiff did get as well as those which it, the defendant, obtained, it would have been able to produce all of the furniture required. Evidently it thought it could because, in addition to the New York contracts which it obtained, it submitted bids for all those which the plaintiff got.

It is obvious that, had the contract not been breached, the plaintiff's volume of business would have been a great deal larger than it was. True, the plaintiff could not have obtained furniture from outsiders but, for all practical purposes, there was no limit to the amount it could get from the defendant. The plaintiff here would not be put in the position which it would have had if the contract had been carried out if it were allowed no more than the difference between the profit which it would have made on the business done by the defendant in violation of the contract and the profit which it did make using other suppliers. It is apparent that it would have been able to obtain the contracts which the defendant obtained as well as the same ones it got. Even in cases where the plaintiff obtained business in direct competition with the defendant, it appears that in all but a small number the defendant's bid was the next lowest responsible bid so that the defendant would have obtained the business in the absence of the competition of Willred, and it follows that the plaintiff would have done that business if it had been representing the defendant. Thus, even in these instances of direct competition a deduction for the business done by the plaintiff is not justified.

Under these circumstances, the applicable rule is that stated in Section 336 of the Restatement of Contracts, comment c., "Gains made by the injured party on other transactions after the breach are never to be deducted from the damages that are otherwise recoverable unless such gains could not have been made had there been no breach. * * * manufacturing facilities can usually be expanded to meet all demands; therefore profit made on the manufacture and sale of a second article is not deducted."

I am unable to allow the plaintiff any recovery for additional lost profits based on its theory that, with the defendant as a supplier, it would have earned more than it did with its substituted suppliers, Norcor and Emeco. The claim in this regard is not unreasonable, but the difficulty with it is that there is no evidence in the record from which the Court can determine with any reasonable degree of certainty whether the arrangements which it had with Norcor and Emeco were any less advantageous than the terms which it could have obtained from the defendant. The contracts between the plaintiff and Norcor and the plaintiff and Emeco were not produced, although it appears that they were in writing, and no explanation was forthcoming as to why the plaintiff did not put them in evidence. The testimony relating to them makes it clear that they contain certain terms differing widely from those of the Westmoreland contract. There is insufficient evidence as to the extent and significance of these differences to meet the plaintiff's burden of proof as to this item of its claim. It is, therefore, disallowed.

One other transaction calls for comment. The plaintiff, in order to build up a volume of business for Norcor, submitted a bid to the New Britain school board and obtained a contract, with the understanding with Norcor that it (the plaintiff) would take no profit on the contract unless Norcor was able to establish a plant in the East, which it never did. The plaintiff now claims from the defendant the profit which it did not make. The claim must be disallowed. The transaction was not entered into with the idea of making a profit and, in effect, amounted to no more than the plaintiff's placing its sales force at Norcor's disposal, gratis, in order to obtain future business advantages. If such transactions could give

rise to damages, there would be nothing to prevent the injured party from selling his goods at any sacrifice price he chose, relying upon being able to collect his profits from the person who wrongfully breached the contract.

 Having found the amount of business which the plaintiff lost as a result of the defendant's breach of the contract, our next problem is to find the profit which it would have made on that volume of business. Williston on Contracts, Section 1346A, points out various methods of proving prospective profits (cited with approval in Massachusetts Bonding & Ins. Co. v. Johnston & Harder, Inc., 343 Pa. 270, 279, 22 A.2d 709). One method is, "Evidence of past profits in an established business furnish a reasonable basis for estimating future profits." The methods are not mutually exclusive, and the Court may consider more than one in arriving at a conclusion, nor do they exclude from the Court's consideration any other relevant evidence which may throw light upon the question. In the present case, the plaintiff having had an established business covering a five year period extending both before and after the breach, the percentage of profit which it actually realized will be the chief consideration. This figure can be obtained by referring to the plaintiff's income tax returns for its fiscal years 1953, 1954, 1955, 1956, and 1957. These returns should give a better picture of what profit, was received on the business done than any method of accounting devised for the purposes of this lawsuit. They are as follows:

| Fiscal Year Ending May 31, | Cost of Goods Sold | Net Profit |
|---|---|---|
| 1953 | $116,260.82 | $11,447.28 |
| 1954 | $229,612.33 | $ 6,095.28 |
| 1955 | $306,973.59 | $ 2,290.34 |
| 1956 | $199,433.45 | $17,220.72 |
| 1957 | $529,781.99 | $ 2,090.53 |

2. These items of expense are claimed separately by the plaintiff as damages for breaches by the defendant before it broke

These figures show that, in the five year period covered, upon a volume of business measured by the total cost of the goods sold, a total net profit of $39,144.15 was realized.

 Some of the above figures, however, must be adjusted because, as a result of the defendant's other breach (defective merchandise, late deliveries, etc.) the plaintiff's expenses during part of the five year period were substantially increased, resulting in a smaller percentage of profit for that part. Since these expenses were abnormal and were incurred as a necessary result of the defendant's defaults, they should be eliminated from any calculation of a percentage on which to base an estimate of lost profits.[2] As allowable, they amount to $15,455.92. They should be subtracted from the expenses for fiscal year 1956 and will increase the net profit in that year to $32,676.64. As a result of this adjustment, the percentage of profit of the total goods sold during the five years will be 3.95%. The lost profit is, therefore, 3.95% of $1,759,512.75 or $69,500.75.

 I disallow the plaintiff's claim for damages arising out of the asserted facts that it was forced to discontinue its entire business as the result of the defendant's breach of contract and that it consequently suffered a total loss of its goodwill. The plaintiff's business was not that of selling an ordinary commodity in an open market. Its sales were in no way promoted by the fact that they came from any particular source, and goodwill which produces repeat orders from satisfied customers was negligible if, indeed, it existed at all. The school boards would call for bids for the furniture they required and would prepare rigid specifications and, if they were met, it did not matter who manufactured the furniture. The only considerations were price and responsibility of the bidder. So far as the damage done to the plaintiff prior to December 1957 is concerned, it will be fully

off the contract and they will be more fully discussed later in this opinion.

compensated by the damages awarded hereby. After that date, the defendant was at liberty to sever its connection with the plaintiff, and there is no evidence whatever that, had the plaintiff been able to submit an acceptable bid, it would have been denied the business because of any impairment of its reputation. In fact, what testimony there is on the point is to the contrary.

■ There remains one item of the plaintiff's income which is in a different category from the profits made by it on the sale of furniture after the breach. Norcor employed the plaintiff as its eastern sales representative and paid $19,500 to the company for this service. Mr. Bliwise testified unequivocally in the trial of the issue of liability that it was the company that was employed. This money represents income that could not have been earned had the Westmoreland contract been in force. Under the rule of the Restatement, supra, it cannot be allowed and, therefore, must be deducted from the amount awarded for lost profits.

2. Damages for defective goods and late and improper deliveries of merchandise while the contract was in force.

Here again the parties are worlds apart in their conception of what would be a just and fair result. Although, from the defendant's brief and argument, it is not too clear whether it concedes that the plaintiff suffered any loss at all as a result of defendant's faulty performance, in its amended "Request for Findings of Fact" (No. 27) it asks the Court to find that "Plaintiffs are entitled to damages for the repair of defective furniture in the total amount of $3,675."—a very small part of the amount ($58,520.89) claimed by the plaintiff on this account.

Unlike the first branch of the plaintiff's case, there is practically no disagreement between the parties as to the rules of law which govern these items. The Uniform Commercial Code (Purdon's Statutes, Title 12A) covers the whole field. Most of the following discussion will, there-fore, have to do with the Court's verdict upon disputed issues of fact.

As to the sufficiency of the evidence to prove this branch of the plaintiff's case, it must be recognized that there is a difference between a case in which the plaintiff is seeking lost profits and one in which he is endeavoring to recover out-of-pocket expenses. In the first class (usually cases in which the plaintiff was prevented by the breach from going into business or in which he was compelled to give up the part of his business which depended upon the contract) the courts have been extremely liberal, the rationale of the opinions being that it would be unfair to deny recovery to a plaintiff in a case in which the wrong done by the defendant has put it out of the plaintiff's power to establish his losses with any great degree of accuracy. As between awarding damages on the basis of a well supported guess (or estimate) and allowing no damages at all, the choice was obvious. In this connection, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S. Ct. 574, 90 L.Ed. 652, has probably been cited more often upon the question of lost profits, at least in the Federal Courts, than any case in the books, and the opinion in that case emphasizes the point that in such cases the defendant is responsible for the deficiencies of the plaintiff's proofs.

In the first branch of the plaintiff's claim in the present case, the breach of contract of itself made it impossible for the plaintiff to prove with exactness what it lost by way of profit. However, its situation as to the second branch of its claim is quite different. At all times, the plaintiff had full control of its own bookkeeping and records and it knew that it had a steadily accruing claim against the defendant for damages, by reason of the latter's repeated faults in performance. There is no such impelling necessity to relax the requirement of accuracy in proving damages in this kind of case as there is in a claim for lost profits. I do not mean to say that proof of out-of-pocket sums claimed as damage must be

precise to the penny but rather that, since it is within the power of the plaintiff to preserve and present the necessary evidence, he should be accurate within the practical limitations of keeping records in the conduct of his business, and the Court should be careful, in view of evidence which he could have but did not present, not to award him a windfall at the expense of the defendant.

### (a) Cover.

■ On the date of the breach, the plaintiff was delivering school furniture to the New York Board of Education under contract F–507. A number of orders from the board remained to be filled. Inasmuch as the defendant had totally breached the contract, the plaintiff was not bound to offer to purchase the necessary furniture from the defendant or to have any more dealings with it. The plaintiff, in order to carry out its contract obligations, in good faith and without unreasonable delay contracted with Norcor for furniture to take the place of that which should have been supplied by the defendant. Having done this and having completed its contract with the New York board, the plaintiff would, upon satisfactory proof, be entitled to damages in the amount of the difference between the cost of its "cover" and the defendant's price to it. Uniform Commercial Code, 12A P.S. § 2–712. However, for the reasons stated in the discussion of the plaintiff's claim for loss of profits on its Norcor business, the claim for cover cannot be allowed, either for loss of profit or for unfavorable freight differential arising from the deliveries at Green Bay, Wisconsin, rather than Lindenhurst, New York.

### (b) Repairs, including labor, materials and travel expenses.

■ It cannot well be denied that the defendant did a poor job in the manufacture of the school furniture which the plaintiff delivered to New York and Baltimore. Under the Uniform Commercial Code, the plaintiff was within its rights in accepting defective furniture (for delivery to the school boards), having it re-paired, and charging the defendant with the cost of the work, including incidental expenses as well as direct labor cost. The plaintiff's claim for these items of damage is made up of labor, $17,466.32 (including "overhead" and 10% for profit), materials, $8,642.91, and repairmen's travel, $4,200.00. After a careful review of the voluminous evidence directed toward this part of the plaintiff's claim comprising hundreds of pieces of paper, I have decided to allow it in the total amount of $13,000.

Although, in arriving at the foregoing fact finding, I have considered each and every item which goes to make up the claim, it is not necessary that I discuss them in detail. However, several of the more important considerations which led to it will be stated.

■ The plaintiff's claim for labor cost includes a 10% item for profit which cannot be allowed as an item of damages. This is not a case like Royal Pioneer Paper Box Mfg. Co. v. Louis DeJonge & Co., 179 Pa.Super. 155, p. 166, 115 A.2d 837, p. 842 in which employees and equipment that "could have been otherwise utilized on profitable jobs" were diverted to repair work attributable to the breach of the contract—a fact which furnished a good reason for allowing the plaintiff a figure which included a profit. On the contrary, the extra labor in this case simply would not have been employed had the furniture not been defective and, though the plaintiff is entitled to be made whole for the breach of contract, he is not entitled to make a profit out of the breach.

I believe that the deduction conceded by the plaintiff for labor cost incurred in repairing the wooden seats and backs (mostly the plaintiff's responsibility) of 2%, apparently little more than a guess, was too low.

Furthermore, although the defendant's courtroom demonstration is subject to criticism as having been conducted by a skilled repairman working under the best conditions and with the greatest incentive for speed and although it failed to

take into account the many delays which would occur in practical operation in a school building and the time consumed in going from school to school, nevertheless it satisfied me that the plaintiff's estimate as to the amount of time reasonably required was too high. The plaintiff's payroll cost for labor employed in making repairs is allowed in the amount of $8,000.

Part of the branch of the plaintiff's claim now under discussion is in the amount of $8,642.91 for materials used in making the repairs. As to a very substantial part of them, the supporting records did not identify the items in a manner which would make it possible to connect them with defective workmanship on the part of the defendant. Such identification as there was was supplied by the testimony of Mr. Bliwise. His testimony was not, and in the nature of things could not have been, complete as to all the items. At one point he offered, as establishing the fact that a certain item was for replacement parts necessitated by the defendant's bad workmanship, the statement "Because I wouldn't have put it on here if it wasn't." The plaintiff's obligation, of course, was to supply sound wood parts and the evidence shows that a substantial part of the total wood replacements was due to defects for which the defendant was not responsible. In addition, the parties were, during their relationship, frequently dealing with this matter of materials furnished by the plaintiff, and many credits were granted by the defendant on this account over a considerable period of time. It would seem that, if the plaintiff, during the performance of the contract, had been in a position to make a properly supported claim for credit for the items it now asks for, it would have presented it. I am of the opinion that not more than a total of $3,000. of expense for materials was proved by evidence sufficiently definite and credible to meet the burden which was the plaintiff's.

Another item making up this claim is for travel expenses of the repairmen in the field. It totals $4,200. The fact that the plaintiff incurred this expense was proved. However, it must be borne in mind that a part of the repair work (not definitely ascertained) was attributable to the wood parts, also that the plaintiff was bound to make these repairs with reasonable efficiency and without incurring useless expense. The amount charged for travel, $4,200., seems to be out of all reason when compared with the cost of the labor involved, $8,000 as allowed, or even with $17,466.32 as claimed. I will allow $2,000. for this item.

### (c) Damages arising from alleged improper delivery.

The plaintiff claims as damages a number of items of expense which it attributes to improper delivery as to place of shipment, place of delivery, manner in which the shipments were made up, or time of delivery. One such item is $2,100., being the amount paid by it for the rental of two warehouses. A brief discussion of this part of the claim will furnish a basis for disposing of the remaining items under this head.

The claim is based on two grounds, first, that the space was needed for the repair of school furniture manufactured by the defendant and delivered to the warehouses and, second, that the defendant's failure to ship in accordance with the purchase orders necessitated placing the furniture contained in a number of the truckloads in a warehouse so that it could be sorted out and proper loads assembled.

It is true that the warehouses were used for the repair of defective furniture, but that obviously was not what they were rented for and their utilization for that purpose did not increase the plaintiff's expenses. If it had, it would have been an expense of doubtful necessity. I have allowed an item heretofore to reimburse the plaintiff for labor expended to make repairs in the warehouse.

The plaintiff's purchase orders to the defendant were made out in accordance with the requirements of individual schools. The defendant would acknowledge these orders as given but would

often ship to the plaintiff in loads made up in a manner designed to keep pace with its production, thus resulting in the shipment of truckloads consisting entirely of one item (all chairs, for example) rather than the assortment required for a particular school.

Shortly after the parties made their original agreement, it became apparent that the defendant's Lindenhurst plant was not going to be able to produce the large quantities they both desired in time for the fall term of school. The defendant was able to make an arrangement with the Bunting Company of Philadelphia to use the latter's facilities during the months of July, August and September, 1955. This change is made the basis of another item under this head consisting of the difference in transportation charges arising from the fact that the plaintiff accepted delivery in Philadelphia rather than Lindenhurst. (The differential in the Baltimore deliveries was favorable to the plaintiff.) This change of locations was discussed with the plaintiff and the plaintiff agreed to it and cooperated with the defendant to the extent of sending one of its officers, Mr. Bliwise, to Philadelphia to assist in the operation of the plant. While he was there he scheduled the production, the shipments were made up under his direction, and the furniture delivered to the warehouses was delivered there by his orders. Under these circumstances, I cannot find that the defendant is liable for improper delivery. True, it did not deliver in accordance with the purchase orders, but the testimony makes it amply clear that the plaintiff waived its right to such delivery. I suspect that this question would never have come up had there not been a falling out between the parties.

I disallow the claim for rental of warehouse space.

The claim for redelivery expenses is for labor in unloading the trucks at the warehouse, sorting the furniture, reloading it and delivering it to the schools.

I have already concluded that the plaintiff waived compliance with the provisions of its orders relating to delivery and elected to warehouse the furniture in order to facilitate production.[3] Under this state of facts, and for the same reasons, the plaintiff cannot recover the "redelivery", etc., items as damages. They are normal consequences of its election to warehouse the furniture.

Having disallowed the portion of the plaintiff's claim presented under the heading of "redelivery, extra stops, rent", it follows that the portion of that expense which was paid by Max Blau and Sons and charged by it to the plaintiff must also be disallowed, standing as it does in no better position than if the amount had been paid directly by the plaintiff.

#### (d) Chair rental.

The issue relating to the item claimed for chair rental, alleged to have been necessarily incurred because of the defendant's late deliveries of Baltimore furniture is mainly one of credibility of witnesses in the light of the circumstantial evidence. This is an expense which was reasonable and proper for the buyer and is recoverable under the Uniform Commercial Code unless there is some excuse for the delay in delivery. The defendant attempted to explain its failure to deliver on time by asserting that it was unable to keep up to the agreed schedule because of the plaintiff's failure to supply it with wooden seats and backs for chairs. The plaintiff established its case on this point by satisfactory evidence, and the defendant's evidence fails to convince me that the plaintiff was responsible for the incurring of this expense. I, therefore, allow the plaintiff's claim in the amount of $2,455.92.

#### (e) Interest.

This item of damages is described by the plaintiff as "Interest on amounts withheld by the School Board beyond the usual time for payment after delivery on account of defects." The

---

3. It is clear that the plaintiff was far more interested in obtaining the maximum production than in strict compliance with the delivery terms of the purchase orders.

amount of interest claimed is $6,313.03. The theory of the plaintiff is that ordinarily the New York board would pay the plaintiff on or before 120 days from date of the invoices and Baltimore within 30 days and that in many cases payment was not made within these periods because of time consumed in repairing defective furniture or in otherwise making good the default.

Although my attention has not been called to any case in which a buyer has been allowed interest on amounts withheld by a subpurchaser from him because of defects in the goods, I believe that Sections 2–714(3) and 2–715 of the Uniform Commercial Code provide for the recovery of such damages if they can be proved.[4] Any plaintiff suing for a balance due from a defendant is entitled to interest from the date of the defendant's refusal to pay, and I see no reason in principle why, in a case like the present, the plaintiff should not be allowed to recover interest on money due but withheld by a third party for varying periods of time, the delay being due to the defendant's breach of contract. However, the difficulty in the present case is not with the applicable law but with the sufficiency of the plaintiff's proof of its claim.

The documentary evidence shows that, in the case of contracts with New York performed for the plaintiff by other suppliers, the date of payment ranged from approximately 60 days after invoice to well over 150 days. Most of the payments were made before 120 days, but the evidence does not show that there was a fixed time for payment by the New York board and 120 days is, at best, an approximation by the plaintiff's witness, Bliwise. The approximation was stated by him to be on the "safe side" and an examination of the evidence seems to justify his characterization of it.

The New York board withheld payment apparently because the furniture was defective. However, the evidence is completely lacking in any identification of the reason that any particular invoice was not paid sooner. As has already been pointed out, there were admittedly in a substantial number of the wood parts supplied by the plaintiff defects not due to the defendant's bad workmanship. It is impossible to tell which invoices were delayed in payment because of defective wood or which were delayed because of defective manufacture or which for both reasons.

I do not think that the plaintiff has proved that the delay, or how much of it, is attributable to the defendant's breaches of its contract. It had this burden and failed to meet it. See Hood v. Meininger, 377 Pa. 342, 105 A.2d 126, 44 A.L.R.2d 1106.

Another difficulty with its claim is that I believe it has waived it, if it ever existed. The parties were doing business with each other continuously. The plaintiff was ordering furniture, the defendant delivering it, the plaintiff paying for it, and various credit memos were being exchanged all the time. During this period a number of the so-called late payments by the New York board occurred, and nowhere is there any indication that the plaintiff considered the defendant responsible for interest on them. When it paid the price of the furniture involved, it waived its claim for interest. It is true that it is impossible to untangle from the mass of records the history of each shipment—whether New York delayed in paying for it, and when the plaintiff paid the defendant for it—but it does seem clear that in no instance did the plaintiff deduct or claim anything for interest when it paid the defendant. What has just been said about New York's delayed payments applies fully to the claim for interest on payments delayed by Baltimore.

No part of the plaintiff's claim for interest on this count will be allowed.

(f) Credit allowed Baltimore school board by Willred.

This item represents a credit which the plaintiff was compelled to allow the

---

4. The language of 2–715 is "any damages from delay or otherwise resulting from the breach."

Baltimore school board in order to obtain a final settlement of its account with the board. The plaintiff had, prior to this settlement, made very extensive repairs to the furniture in Baltimore. The repairs were, in large part, directed towards the structural parts of the furniture. The bulk of Baltimore's claim was based on the fact that the wood provided by the plaintiff was too dark and also that a number of the woods were cracked. As to the cracked wood, there is no way to determine how much of the defects, if any, was due to the fault of the defendant in manufacturing. There is a small part of the claim based upon the cost of replacing screws in the backs of chairs which were for some reason unsatisfactory. The claim was not settled for the full amount and I am unable to find what part of the settlement properly represents a charge against the defendant. I, therefore, disallow the claim.

#### (g) Balance due from New York for furniture alleged to be impractical to repair.

The plaintiff claims from the defendant an unpaid balance of $1,600. which New York has withheld because repairs have not been made to defective furniture in that amount. No attempt was made by the plaintiff to identify the nature of the defects, whether they were found in the wood or in the parts of the furniture for which the defendant was responsible. In view of this complete lack of evidence on the point, I must disallow the claim.

#### 3. Affirmative claims by the defendant.

There remain two items which the defendant claims are due to it from the plaintiff. First, money that would have been due for the purchase price of furniture if it had not been defective. This amount I find to be $18,846.53. It is allowed. Second, the defendant claims $3,086.48 as an overpayment to the plaintiff in the partial accord and satisfaction which the parties entered into with reference to the discount allowed to the New York board discussed in the prior opinion on liability. When the parties entered into their accord and satisfaction, the defendant agreed to pay 75% of the discount allowed to the New York board. At the time, both parties in good faith believed that the discount would be 7%. In fact, the plaintiff was compelled to allow only 5%. The defendant issued its credit memorandum to the plaintiff on the basis of the 7% figure resulting in an overpayment to Willred of $3,086.48, credit for which must be allowed against the plaintiff's recovery.

#### Summary

The result is that the plaintiff is entitled to recover judgment computed as follows: $69,500.75 for breach of the exclusive distributorship contract; $15,455.92 damages for breach in performance of the defendant's obligations under the contract. The total is $84,956.67. From this amount must be subtracted $19,500., the commission received by the plaintiff for services to Norcor as the latter's sales representative, $18,846.53 for furniture not paid for, and $3,068.48, overpayment in the accord and satisfaction, totalling $41,415.01, leaving a net recovery of $43,541.66 due the plaintiff from the defendant.

No interest prior to the date of judgment is allowed on any claim dealt with in this opinion. The part of the claim based on breach of the distributorship contract was totally unliquidated and susceptible of ascertainment only from the evidence. Although portions of the claim for breaches in the performance of the contract were fairly well liquidated, the claim as a whole was far in excess of anything which could reasonably be found to be due. For this reason the defendant could hardly have been expected to have tendered payment.

The defendant's counterclaim was liquidated, but it was abundantly clear that the plaintiff was in a position to assert a substantial claim far in excess of the money found due the defendant. At any rate, allowance of interest is within the discretion of the Court. See Crawford's Estate, 313 Pa. 127, 169 A. 438.

Judgment accordingly.