**MUSTANG FUEL CORPORATION, a corporation, Plaintiff-Appellant,**

v.

**YOUNGSTOWN SHEET AND TUBE COMPANY, an Ohio Corporation, Defendant-Appellee.**

**No. 74–1396.**

United States Court of Appeals, Tenth Circuit.

Submitted March 25, 1975.

Decided May 7, 1975.

Ed Abel and Ben T. Lampkin, Jr., Oklahoma City, Okl., for appellant.

Calvin W. Hendrickson and Gary W. Gardenhire, Oklahoma City, Okl., for appellee.

Before HILL, SETH and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Mustang Fuel Corporation (Mustang) appeals from an order of the Trial Court granting Summary Judgment to Youngstown Sheet and Tube Company (Youngstown), and overruling Mustang's motion for new trial and rehearing. Jurisdiction vests by reason of diversity.

Youngstown is a manufacturer of metal pipe. In 1961 Youngstown sold to Mustang some 37 miles of 12¾″ outside diameter, .203 wall, 27.22#/Ft. Youngstown Grace X–46 electric weld black plain end line pipe. It was to be manufactured, pursuant to the purchase order, in accordance with the API (American Petroleum Institute) specifications "5LX".[1] The pipe was to be used by Mustang for the purpose of transporting natural gas. Following delivery, the pipe was subjected to high pressure tests, coated with applied coal tar enamel (but was not "wrapped"), and was buried in place by an independent contractor employed by Mustang.

After approximately three years of service, several ruptures developed in the pipe. Mustang reduced the pressure in the pipe and requested that Youngstown investigate the failures and make an analysis of the cause. Youngstown's analysis report indicated that it believed that the pipe had not been properly coated and wrapped by Mustang before it was laid and that it was now being subjected to "preferential corrosion" caused by action of the "hot" soil in which it was laid. In order to remedy the situation, and to prevent future failures, Youngstown suggested that Mustang expose the pipe and "rehabilitate" it by giving it a proper coating and wrapping.

Apparently considering Youngstown's recommendations to be impractical (deposition of Edward C. Joullian, III), Mustang decided instead to attempt a remedy through the use of "cathodic" protection.[2]

Subsequently, in December of 1967, a rupture and explosion occurred on the property of Ervin W. Lemke near Okarche, Oklahoma, resulting in the death of Mrs. Lemke, and serious injuries to members of her family. Mustang, while denying liability, eventually settled with Lemke in amount of $680,000 in a suit in

---

1. These specifications provide detailed standards to be used in the manufacture of pipe and include quality test controls.

2. This method, theoretically, prevents corrosion by discharging the electrical attack upon the pipe (which supposedly causes "preferential corrosion") to the surrounding soil.

which Youngstown was not a participating party.[3]

In the instant action, Mustang seeks recovery on two grounds: first, via indemnity, for the amount paid the Lemkes for the resulting death and personal injuries; and secondly, for the economic loss incurred in replacing the allegedly defective pipe.

In its memorandum opinion filed December 30, 1971, the Trial Court found that, based upon the pleadings, depositions and stipulations of the parties, there existed no genuine issue as to any material fact. It granted Youngstown's motion for Summary Judgment. In Mustang Fuel Corp. v. Youngstown Sheet and Tube Company, 480 F.2d 607 (10th Cir. 1973), we reversed that order without expressing any opinion on the merits of the action. The reversal was predicated on the failure of the Court to comply with the hearing and notice requirements of Rule 56, Fed.R.Civ.P., 28 U.S.C.A. Upon remand, and after full compliance with the above rule and a review of the entire file, the Trial Court again sustained Youngstown's motion for Summary Judgment. Judgment was entered dismissing the complaint and the cause of action.

On appeal, Mustang challenges the Summary Judgment Order of the Trial Court contending that there exists genuine issues of material fact, and that it has established an actionable cause based upon: (1) breach of express warranty; (2) breach of implied warranties of merchantability and/or fitness for particular use; and (3) strict liability in tort. We

shall treat each of these contentions in the order above stated.

■ We recognize that appellate courts, in assessing motions for summary judgment, must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues. Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 494 F.2d 168 (10th Cir. 1974); James v. Atchison, Topeka and Santa Fe Railway Company, 464 F.2d 173 (10th Cir. 1972). Pleadings and documentary evidence are to be construed liberally in favor of the party opposing such a motion. Harman v. Diversified Medical Investments Corporation, 488 F.2d 111 (10th Cir. 1973); Shawver & Son, Inc. v. Oklahoma Gas & Electric Company, 463 F.2d 204 (10th Cir. 1972); Building Mart, Inc. v. Allison Steel Manufacturing Co., 380 F.2d 196 (10th Cir. 1967). The movant must demonstrate entitlement beyond a reasonable doubt and if an inference can be deduced from the facts whereby the non-movant might recover, summary judgment is inappropriate. Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra; James v. Atchison, Topeka and Santa Fe Railway Company, supra. However, notwithstanding the difficult legal hurdles confronting a party moving for summary judgment, the burden is not an impossible one.

## BREACH OF EXPRESS WARRANTY

Mustang contends that Youngstown breached its express warranty to manufacture the pipe to meet API specifications as provided for in the purchase order.[4] In support of this contention, Mus-

---

**3.** In its pretrial statement of facts and issues, Youngstown contends that whether Mustang was a "volunteer" in making this payment prior to Youngstown's involvement, and is therefore not entitled to indemnity, is an issue which will arise only if it is found that Mustang has established a prima facie case for recovery.

**4.** As to the alleged failure of Youngstown to manufacture the pipe in accordance with API specifications, we are not convinced that Mustang did not err in proceeding in the instant action under a theory of breach of express

warranty rather than for *breach of contract.* *See,* Sunray DX Oil Company v. Great Lakes Carbon Corporation, 476 P.2d 329 (Okl.1970). In any event, we do not deem this distinction to be critical here in light of our holding, *infra,* that the Trial Court did not err in finding that there exists no substantial evidence as to an element essential for recovery under either theory, i. e., that the pipe did not meet the particular description set out in the purchase order.

tang offered the depositions of two expert witnesses, Frank Weaver, a metallurgist and owner of an independent testing agency, and Professor Robert F. Hochman, a specialist in the field of metallurgy at the School of Chemical Engineering, Georgia Institute of Technology.

Weaver testified to the effect that, under his interpretation of the published API specifications, and on the basis of Youngstown's own records kept in connection with the manufacturing and testing of the pipe, API standards had been violated. In rebuttal, Youngstown introduced the deposition of James Ubben, assistant director of the API, who testified as an official representative of the API as to that body's interpretation of its own standards. His testimony indicated that Weaver had misinterpreted the applicable API standard.[5] Under the interpretation given the standard by Ubben, it would appear from the record that—at least in relation to the tests actually performed by Youngstown on the subject pipe are concerned—API standards were met.

In its memorandum opinion, the Trial Court, in light of Ubben's testimony, rejected Weaver's as to the interpretation to be given the applicable API specification. The Court held that it had "no probative value." Mustang asserts that the Court, in effect, weighed the credibility of these two expert witnesses and that in rejecting the testimony of Weaver, the Trial Court exceeded its authority, i. e., by deciding as a matter of law that which should have been a determination of fact, thus precluding summary judgment. We disagree.

■ We have held that whether a witness is qualified to testify as an "expert" to any matter of opinion is a preliminary determination for the trial judge and his decision is conclusive unless shown to be clearly erroneous or the result of an abuse of judicial discretion. Chapman v. United States, 169 F.2d 641 (10th Cir. 1948), cert. denied 335 U.S. 860, 69 S.Ct. 134, 93 L.Ed. 406 (1948); Bratt v. Western Air Lines, 155 F.2d 850 (10th Cir. 1946), cert. denied 329 U.S. 735, 67 S.Ct. 100, 91 L.Ed. 635 (1946). As to whether a witness possesses the "capacity" to testify as an "expert", Wigmore states:

(1) The capacity is *in every case a relative one, i. e.,* relative *to the topic about which the person is asked to make his statement.* The object is to be sure that the question to the witness will be answered by a person who is fitted to answer it. His fitness, then, is a fitness to answer on that point. He may be fitted to answer about countless other matters, but that does not justify accepting his views in the matter in hand.

2 Wigmore on Evidence § 555, at 634 (3rd Ed. 1940).

■ Youngstown agreed to manufacture the pipe to *API specifications.* The Trial Court, in attempting to determine if there existed an issue as to whether this express warranty had been breached, was faced with the problem of what the *API standards were.* While Weaver, as a metallurgist, may have qualified to render an expert opinion as to what those standards *should be* ideally (in order to insure the manufacture of quality pipe), this was not the "topic" at issue. There is nothing in this record to indicate that Weaver possessed that special knowledge or "expertise" which would have qualified him to render an *expert opinion* as to what *in fact* the API intended its standards to mean.

5. The standard here in dispute involves that portion of API Specification 5 LX which sets maximum levels for certain properties, e. g., sulphur, commonly found present in this product. The standard prescribes both a "ladle" and a "check" analysis for sulphur content in the steel used for manufacturing pipe; sets a maximum value for sulphur in the ladle analysis; and establishes an allowable "tolerance" of + .01 between the two tests. Weaver apparently interpreted the term "tolerance" used in this standard to mean the allowable *difference* in sulphur content between the actual ladle analysis and the actual check analysis, whereas Ubben contended that "tolerance" here indicated the maximum level by which the check analysis could *exceed the maximum* ladle specification for sulphur content.

38

Under these circumstances, and in view of the fact that the Trial Court had before it the API's own official interpretations of its standards (at least Mustang has not challenged the "authenticity" of this purported "official" interpretation), we hold that the Trial Court did not abuse its discretion in rejecting the "expert opinion" testimony offered by Weaver as being of no probative value.[6]

■ Mustang also offered the deposition of Dr. Robert Hochman who testified that according to the "microprobe analysis" and other tests which he ran on the pipe, it was, in fact, defective in at least two respects, i. e., an incomplete closure of the pipe seam and a sulphur concentration in the "heat effective zone" of the pipe which exceeded the maximum level established by the API specifications. Both of these conditions, he testified, could have contributed to the corrosion which, allegedly, resulted in the explosion. The Trial Court again rejected this testimony as having "no probative value" relating to the issue of whether API standards had been met, since the tests performed by Dr. Hochman were not included in the tests required by the API in determining whether or not the pipe conformed to API standards.

In Sunray DX Oil Company v. Great Lakes Carbon Corporation, *supra,* the Court stated:

"Courts are not permitted to speculate as to whether a term employed in a mercantile contract is material, but must give effect to every term of the contract which the parties have chosen for themselves."

Under that rule, we must assume that the parties intended for the contract provision involved in the present case to mean exactly what it says . . . .

476 P.2d 329 at 342.

■ In ordering pipe "to API specifications 5LX" Mustang, it must be assumed, understood that this specification prescribed what tests were to be performed during the manufacturing of the pipe since the specifications included established quality control testing procedures. The specifications did not include those tests performed by Hochman. Mustang cannot now be heard to complain that these additional tests were not performed, and it cannot now rely upon their results as evidence that API standards were not met. Mustang did not contract to receive a perfect product, but rather one which met API standards and which, impliedly, was to be tested solely by the means and in the manner established by the API within those standards. Whether it could be proven by additional testing that this pipe was defective or did not meet API standards is immaterial. Mustang is bound by the express language of its own contract. Furthermore, Mustang cannot complain as to the sufficiency of Youngstown's proof that it performed all the tests required by the API specifications since it was afforded the opportunity—which it chose not to exercise—to be present during this testing to insure that it was properly conducted.

Under all of these circumstances, we hold that the Trial Court did not err in rejecting the testimony of Dr. Hochman and, there being no cogent evidence that API specifications were not met, summary judgment was properly granted against Mustang's theory of breach of express warranty urged upon the Court.

BREACH OF IMPLIED WARRANTIES
OF MERCHANTABILITY AND/OR
FITNESS FOR PARTICULAR USE

Mustang argues that Youngstown breached its warranty of merchantability of the subject pipe. The argument is advanced in a summary, token manner, without recital of cogent authority. The

6. We note that Weaver himself conceded that his interpretation of this standard had viable

force only in the absence of an "official" interpretation of the specification by the API.

Oklahoma Supreme Court has defined "merchantability" to mean ". . . of a quality such as is generally sold in the market and suitable for the purpose of which they are intended, although not of the best quality." Wallace v. L. D. Clark & Son, 74 Okl. 208, 174 P. 557, 558 (1918). Mustang—in its brief—seems to concede that pipe manufactured in accordance with API standards is merchantable and would pass without objection in the trade. As we previously observed, Mustang has presented no substantial evidence that this pipe was not so manufactured. Its reliance here upon the testimony of Dr. Hochman is again unwarranted. *Compare,* Mohasco Industries, Inc. v. Anderson Halverson Corporation, 520 P.2d 234 (Nev.1974), where the Court held:

> [an] implied warranty of merchantability is limited by an express warranty of conformity to a precise description supplied by the buyer, and if the latter warranty is not breached, neither is the former.
>
> 520 P.2d 234, at 236.

The more troublesome issue, we believe, centers upon whether, under Oklahoma law, there arises under the circumstances presented here, an implied warranty on the part of Youngstown that this pipe was fit *for a particular use,* i. e., the transportation of natural gas.

Youngstown contends that the rule in Oklahoma is such that no warranty of fitness for a particular purpose arises out of a contract to supply a specific, described or definite article, citing Obenchain & Boyer v. Incorporated Town of Roff, 29 Okl. 211, 116 P. 782 (1911). Mustang refutes this contention, relying upon two later Oklahoma decisions, Markle v. Stekoll, 112 Okl. 287, 240 P. 1044 (1925) and Markle v. Stekoll, 138 Okl. 171, 280 P. 842 (1929), for the rule which it contends "superseded" the *Obenchain* decision.

Mustang points to the following language in Markle v. Stekoll (Okl.1925), *supra,* indicating that the Oklahoma courts have abandoned (if it had ever

been accepted) the rule urged by Youngstown:

> The rule is well settled in this jurisdiction as contended for by the plaintiff, that the seller of an article by description warrants [by] implication, [that] if the same is not expressly set forth in the contract, that the article shall not only ·correspond with the description, *but shall be suitable to do the work [for] which it was made to do.* (Emphasis added).
>
> 240 P. 1044 at 1045.

This language, it is urged, indicates a warranty of fitness for intended purpose, and not merely of merchantability.

We note, however, in each of the applicable Oklahoma opinions decided prior to *Markle,* the following rule was approvingly quoted, derived from Davis Calyx Drill Co. v. Mallory, 137 F. 332 (8th Cir. 1905):

> But *no implied warranty that a machine, tool or article is suitable to accomplish a particular purpose or to do a specific work arises* where the vendor orders of the manufacturer, or purchases of the dealer, a specific, described, or definite machine, tool, or article, although the vendor knows the purpose or work which the purchaser intends to accomplish with it, and assures him that it will effect it. Such an assurance is but the expression of an opinion, when it is followed by a written contract, complete in itself, which is silent upon the subject. *The extent of the implied warranty* in such a case *is that the machine, tool, or article shall correspond* with the description or exemplar, and that it *shall be suitable to perform the ordinary work* which the described machine is made to do. (Emphasis added).
>
> 137 F. 332 at 334–35.

*See,* Stanford v. National Drill & Mfg. Co., 28 Okl. 441, 114 P. 734 (1911); Obenchain & Boyer v. Incorporated Town of Roff, *supra* ; W. H. Coyle Consol. Cos. v. Swift & Co., 42 Okl. 613, 141 P. 1114 (1914).

We believe that it is apparent that the Court in *Markle* was referring *only* to the latter part of the *Mallory* rule, and that viewed in context that portion of the rule discussed in *Markle* deals only with warranty of merchantability. Simply because the Court in *Markle* did not elect to recite the entire rule it had previously and consistently cited with approval, does not indicate, in our judgment, that it thereby intended to "supersede" its prior line óf decisions. Nor are we convinced that such an intent may be inferred from the dicta of the Court in its decision in Markle v. Stekoll (Okl. 1929), *supra,* relied upon by Mustang.

■ We further note that this same interpretation of state law was presented to and rejected by the Trial Court. We have held that the views of a federal district judge, who is a resident of the state where the controversy arose in a case involving interpretations of the law of that state, carry extraordinary persuasive force on appeal where there are no state decisions on point or none which provide a clear precedent. United States v. Wyoming National Bank of Casper, 505 F.2d 1064 (10th Cir. 1974); Hardy Salt Company v. Southern Pacific Transportation Company, 501 F.2d 1156 (10th Cir. 1974); Casper v. Neubert, 489 F.2d 543 (10th Cir. 1973); Industrial Indemnity Company v. Continental Casualty Company, 375 F.2d 183 (10th Cir. 1967).

■ In any event, even if the rule exists as urged by Mustang, we find no evidence in this record tending to establish that Mustang *in fact* relied upon Youngstown's skill, judgment, or representations in selecting this pipe as fit for the particular purpose intended by Mustang. *See,* Aluminum Company of America v. Electro Flo Corporation, 451 F.2d 1115 (10th Cir. 1971); Vitro Corporation of America v. Texas Vitrified Supply Company, 71 N.M. 95, 376 P.2d 41 (1962). Mustang's bald allegation that such reliance was present is insufficient to satisfy any evidentiary test. In Marathon Battery Company v. Kilpatrick, 418 P.2d 900 (Okl.1965), the Court recognized the rule that an implied warranty of fitness may be destroyed by the absence of the purchaser's reliance. It stated:

We decline to hold such transaction constituted *sale of a specified article,* under its patent or trade name, *which destroyed the implied warranty of fitness because the transaction showed a choice determined by the purchaser* which superseded the seller's judgment. (Emphasis supplied).

418 P.2d 900, at 912.

We hold that the Trial Court did not err in granting Summary Judgment contrary to Mustang's theories of breach of implied warranties of merchantability and/or fitness for particular use.

## STRICT LIABILITY

The Summary Judgment appealed from in this action was entered on January 25, 1974. On April 23, 1974, the Supreme Court of Oklahoma ruled in Kirkland v. General Motors Corporation, 521 P.2d 1353 (Okl.1974), that Oklahoma was then adopting the doctrine of strict liability in tort or, as the Court preferred to call it, "Manufacturers' Products Liability." The Court, in its opinion stated:

Because of the obvious impact of this decision and its effect on basic concepts of law, procedures and rules in Oklahoma, we specifically hold that the law hereby established will be applied prospectively to all cases for trial from and after the date the mandate issues herein; and may likewise be applied by the appellate courts in cases which have been tried and are for decision on appeal where it would not prejudice the rights of the litigants.

521 P.2d 1353, at 1368.

In Sterner Aero AB v. Page Airmotive, Inc., 499 F.2d 709 (10th Cir. 1974), we held that *Kirkland* would be applicable to a summary judgment entered in an action arising under the same time sequence as the instant case.

■ While we accordingly hold that *Kirkland, supra,* is controlling in relation to Mustang's allegations based

upon its theory of strict liability, we deem it appropriate, in light of the fact that the *Kirkland* decision was not decided when the Trial Court entered Summary Judgment herein, and further because there is no indication in this record that the doctrine of strict liability was in anywise argued to or briefed before the Trial Court, to remand this aspect of the instant case for preliminary determination by the Trial Court as to the applicability of the doctrine to the facts of the instant case or its preclusion by the defenses raised herein for the first time by Youngstown and for such further proceedings as the Court deems appropriate.

Affirmed in part and remanded with instructions.