**BLOCKHEAD, INC., Plaintiff,**

v.

**The PLASTIC FORMING COMPANY, INC., Defendant.**

**Civ. No. 14709.**

United States District Court, D. Connecticut.

Oct. 31, 1975.

Kiley, Feldmann, Whalen & Devine, Oneida, N. Y., for plaintiff; by James J. Devine, Jr., Spencer G. Feldmann, Oneida, N. Y.

DiSesa & Evans, New Haven, Conn., for defendant; by Frederick W. Danforth, Jr., Gordon A. Evans, New Haven, Conn.

LUMBARD,* Circuit Judge:

Blockhead, Inc., a New York corporation and former distributor of wig accessories, has brought this diversity action against The Plastic Forming Company, Inc. ("PFC"), a Connecticut corporation involved in blow-molding plastic parts, for breach of warranty in the manufacture of wiglet cases. Blockhead claims that PFC, contrary to express and implied warranties, produced and shipped wiglet cases that were poorly finished and that contained defective handle housings which made the cases unfit for their intended purpose. Blockhead seeks to recover damages allegedly resulting from defendant's breach.

After a seven-day trial, concluded on October 16, 1975, the court finds Blockhead's claim to be without merit and accordingly dismisses the complaint.

I

In 1969, Morris Friedman, a part owner of Blockhead, served as its president. Friedman had long been involved in the plastics industry and specifically in the manufacture and sale of plastic wig and wiglet cases. He has also held design and mechanical patents for various wig cases and wig accessories. Friedman's familiarity with the wig accessory industry dates back to the early 1960's when he was affiliated with a company that manufactured between five and eight million wig cases. In the mid-1960's, Friedman left this firm to work for Gibbs & Company, a distributor of health and beauty aids. While working at Gibbs & Company, Friedman met Andrew Dembicks and George Wilcox, who worked at the time for W. R. Grace & Co., and who in 1969 were associated with PFC. Friedman and Wilcox designed a wig case that Grace was to manufacture for distribution by Gibbs. These cases were produced through a process invented by Peter Schurman, the current president of PFC.

Friedman left Gibbs and subsequently became associated wtih Blockhead. In February 1969, Friedman entered into an agreement with Oneida Molded Plastics Corporation ("Oneida") of Oneida, New York, whereby Oneida manufactured another wig case that Friedman had designed for distribution by Blockhead. This wig case consisted of three basic parts: the body of the case, a pedestal which would fit inside the case and support the wig, and a handle that was separately designed and patented by Friedman. Oneida manufactured all the parts using the injection-molding method of making plastic products. Production began in September 1969 and eventually 33,000 wig cases were marketed nationwide.

Friedman also wanted Blockhead to market a wiglet case which would serve as a smaller version of the wig case. Early estimates obtained by Friedman for production of a wiglet case suggested that the manufacture by injection molding was prohibitively expensive. In February 1969, however, Friedman was contacted by Dembicks and Wilcox, who had joined Schurman at PFC. They informed Friedman that they could produce a wiglet case through the relatively inexpensive process of blow-molding. The initial price quoted for a blow-molded wiglet case was approximately seventy-five cents per case and the $5000 cost for tooling the mold was about one-fifth of the price that Friedman would have had to pay for a mold to be used in the manufacture of an injection-molded wiglet case.

Although blow-molding of plastic parts was well established at this time, and

* Sitting by designation.

Friedman was familiar with the process, PFC's procedure was unique in that it produced plastic parts with both interior and exterior walls. The blow-molding process differs from injection-molding in that the latter system permits control of the thickness of the wall in any given part of the plastic without affecting other parts of the plastic. Both "double wall" and "single wall" blow-molding impose severe limitations on the extent to which the thickness of the wall at one point can be increased without affecting the rest of the product which is molded simultaneously.

Dembicks, Wilcox and Friedman met on February 27, 1969, to discuss further the production of a blow-molded wiglet case. Dembicks submitted drawings, but Friedman rejected them as too dissimilar from the wig case being manufactured by Oneida. He imposed four conditions on the manufacture of a wiglet case: it must be a scaled-down (twelve-inch high) version of the wig case; it must use the same handle—to be supplied by Oneida—as the wig case; it must use the same pedestal—also to be supplied by Oneida—as the wig case; and it must have the same outside texture as the wig case. Between the first meeting in February and the start of production in October 1969, Friedman provided PFC with specific height and width dimensions for the wiglet case and rejected suggestions that the handle housing be broadened to increase the amount of plastic that would be blown into the area supporting the handle.

Dembicks submitted new drawings of the wiglet case for Friedman's approval on April 29, 1969. Friedman insisted on several changes in the drawings and these corrections were incorporated in a final set of blueprints submitted on May 7, 1969. These blueprints provide only height and length measurements for the handle housing; no specification indicates a required thickness between the top of the housing and the hole in which the handle would be inserted. About this same time, PFC made a wooden model of the wiglet case which showed the dimensional details of the case and served as the model for the mold to be used in the manufacture of the cases. The handle housing in the wooden model was solid; thus it has no bearing on the thickness of the housing wall that PFC was to use. Friedman approved both the blueprints and the wooden model.

Problems began to emerge in the summer of 1969 with the first pre-production models of wiglet cases. The lugs on the handles were manufactured with an excessive distance between the stop ledges. Consequently the handles fell out of the handle housing. Oneida was to remedy the problem by reducing the distance between the stop ledges from 2 inches to $1\frac{7}{8}$ inches. After some additional problems with handles that provided insufficient space between the stop ledges, PFC submitted fifteen pre-production wiglet cases for Friedman's inspection on September 29, 1969. Friedman made a thorough inspection of the interior and exterior of the cases and informed PFC of problems, such as uneven trim, which he described as minor. None of these cases had ruptured handle housings and no mention was made of the thickness of the handle housing wall. After receiving assurances from Dembicks that the noted defects would be corrected, Friedman placed an order with PFC for the production of 25,000 wiglet cases. Blockhead was to pay approximately $1.00 per case for manufacture, assembly, and quality control. Friedman sold the cases for various prices, depending on the particular customer, but most cases were sold for $2.52. Some, however, were sold for as much as $4.65. Blockhead suggested a retail price for the case of $8.95.

The run of 25,000 cases was never completed. After PFC had manufactured 10,000 to 11,000 wiglet cases, Friedman requested that production cease. Dembicks and Wilcox, however, persuaded Friedman to continue production for a short period. On Friedman's order PFC finally halted production in mid-Decem-

ber 1969 by which time between 18,000 and 19,000 cases had been manufactured.

The court finds that a combination of factors led Friedman to discontinue PFC's production of the wiglet cases. First, Friedman expressed concern that developments in the manufacture of wiglets with synthetic hair lessened the amount of care necessary for the hairpiece and rendered the cases obsolete. Friedman testified that despite various promotional efforts the cases were not selling and a letter from a distributor indicates that "nothing much is moving on this item (the wiglet cases)." Second, Friedman had received numerous complaints from distributors and customers that the cases suffered from poor trim, rusting of the hinge pin, and improper cleaning. Although Friedman testified that he had seen isolated instances of ruptured handle housings during an inspection of cases at Blockhead's warehouse about October 10, 1969, that defect had not been a factor in his decision to terminate production. Schurman testified that any defective cases were discarded and as Friedman never returned or sought credit for any cases with ruptured handles, the court credits Schurman's testimony.

In January 1970, Wilcox and William Brink, a vice-president of PFC, visited Friedman to request payment of the balance owed by Blockhead for production of the 18,000 to 19,000 cases. Friedman refused to pay because of the problems he said he had encountered with the quality of the goods. At the end of January, the parties reached a settlement whereby PFC agreed to a rebate of ten cents on each of 12,000 cases then held in storage. PFC also agreed to waive rental charges for storage space at its plant, to maintain charges for future runs at the level quoted in May 1969, and to undertake responsibility for tooling and providing a new, injection-molded latch. Upon reaching this settlement, Friedman remitted one-half of the balance due. In late February 1969, PFC

further agreed to repair, replace, or issue credit for cases returned by Friedman's customers because of specified defects. Friedman then paid the remainder of the money he owed to PFC. Blockhead, however, never returned any cases for repair, replacement, or credit pursuant to PFC's offer.

Friedman testified that during the spring and summer of 1970 he began to receive what he described as a deluge of complaints concerning ruptured handle housings. According to Friedman, the flaws were so widespread that Friedman's customers refused to sell the products and demanded credit for the wiglet cases they held in inventory or permission to return the cases to Friedman. He claimed only 1875 cases were sold and not returned as defective. No records were introduced to support this statement. Friedman testified that he authorized disposal of the remaining cases by some customers and discarded most of the cases stored at Blockhead's warehouse. PFC had shipped several thousand cases to Oneida to await distribution to customers, and most of these cases, too, were later destroyed. Again, the number of cases involved is speculative. Friedman testified that he gave several hundred cases to charities or to his employees and disposed of 4620 in the trash picked up at Blockhead's warehouse. These figures, however, have been culled from Friedman's memory, which at trial often appeared faulty, and not from any business records.

Throughout this period Friedman and Schurman discussed and dismissed possible solutions to Friedman's claims of defective handle housings. Schurman refused to accept responsibility for the inoperative handles, presumably because he considered the ruptures to be symptomatic of a fault in the handles supplied by Oneida rather than in the handle housings. Friedman, however, in a letter to Schurman of September 29, 1970 asserted that the "paper thin" handle housing walls were the cause of the ruptures. Most of the walls rang-

ed from .010 to .020 of an inch in thickness. Perceiving the handle housing as the source of the problem, Friedman demanded that PFC either replace the cases or credit Blockhead for the cases produced. Friedman never informed Schurman that he was disposing of the cases in Blockhead's warehouse and at Oneida. Schurman's refusals to accede to Friedman's demands led Blockhead to institute this suit in November 1971. On November 23, 1971 Friedman and Dembicks met at Oneida to inspect wiglet cases stored there. About eighty percent of the cases selected at random and inspected at Oneida had ruptured handle housings.

## II

■ Defendant submits that the settlement reached in January and February of 1970 was a complete accord and satisfaction with respect to all complaints concerning the wiglet case and thus bars any recovery by plaintiff. The court finds that the settlement covered only specified defects and does not constitute an accord with respect to unmentioned problems regardless of when they appeared.

Settlement negotiations began in mid-January 1970 after Friedman refused to make payments due to PFC for manufacture of the wiglet cases. Dembicks arranged for Friedman to visit PFC's plant in order to establish a quality control program and discuss the overdue accounts receivable. Dembicks offered to rework the cases that PFC held in inventory and to requote prices for further production of cases. Friedman never made the scheduled trip to PFC. Instead, Brink met with Friedman in New York. In a letter of January 27, 1970, Brink offered Friedman a ten cent credit on each of 12,000 cases then in inventory, a price of $1.065 per case to complete assembly of parts then held in inventory, a waiver of storage charges, and assurances on costs of future runs during the succeeding 120 days. Friedman was to pay the $3200 balance on his account and

make shipping orders available to PFC as soon as possible. Friedman paid half of his outstanding balance to PFC, but requested modification of the terms that Brink offered. On January 30, 1970, Brink wrote again to accept the modifications suggested by Friedman. These revisions concerned the need for a clean latch, assembly of the case, and costs of future runs. When Friedman continued his refusal to make the remaining payments, Schurman wrote on February 27, 1970, offering to repair, replace, or issue credit for individual cases returned by Friedman's customers because of defective "hinge or latch functioning, handle mounting bracket drilling, or markedly excessive flash." Friedman then paid the outstanding balance due.

It is clear from this correspondence between PFC and Friedman that the settlement negotiations concerned only the problems of hinge and latch function, cleanliness of the case, rusting of the pin, and improper trimming. Only in the February 27 letter was the handle housing mentioned at all, and then only in relation to isolated cases of improper drilling. No mention is made of excessive numbers of ruptured handle housings. Indeed, it is not clear when the extent of the handle housing problem became apparent. Friedman testified that he noted a few such housings during an inspection of cases at Oneida in October 1969. Not until the following spring and summer, however, did Friedman receive complaints from customers about the housings.

■ The terms of an accord and satisfaction are to be strictly construed. A settlement accepted with respect to injuries that have already occurred will not constitute an accord and satisfaction with respect to damages that have not yet accrued. *Keller v. Rhode*, 109 Conn. 244, 146 A. 288 (1929). Nor will a settlement with respect to some issues of a dispute constitute an accord and satisfaction of other issues not explicitly included within the settlement provisions.

1024

See *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786 (5th Cir. 1971); *Fairview Farms, Inc. v. Reynolds Metals Co.,* 176 F.Supp. 178 (D. Ore.1959); *Willred Co. v. Westmoreland Metal Mfg. Co.,* 200 F.Supp. 55 (E.D.Pa. 1959); *Searing v. Cohen,* 191 Misc. 1006, 80 N.Y.S.2d 44 (Sup.Ct. 1st Dept. 1948). Thus the court finds that the January and February 1970 settlement did not constitute an accord and satisfaction with respect to the handle housing problem not mentioned in that settlement. We pass, therefore, to plaintiff's claim of breach of warranty.

### III

■ In a breach of warranty action, a plaintiff may recover only after demonstrating that a warranty existed, that defendant breached the warranty, and that the breach was the proximate cause of the loss sustained. Conn.Gen.Stat. Ann. § 42a–2–314 Official Comment 13; *Heil v. Standard Chemical Manufacturing Co.,* Minn., 223 N.W.2d 37 (1974). Plaintiff herein has failed to establish any one of these elements by a preponderance of the evidence.

A. Existence and Breach of a Warranty

■ The Uniform Commercial Code as adopted in New York and Connecticut[1] recognizes three different warranties of quality, either express or implied, and plaintiff argues that all three arose by virtue of the course of conduct involved in the manufacture of the wiglet cases. In order to create the first of these warranties—the implied warranty of fitness for a particular purpose—the plaintiff must demonstrate that the seller knew of the buyer's particular purpose, that the seller knew that the buyer was relying on the seller's skill to provide a product that would satisfy the particular purpose, and that the buyer did in fact rely on that skill. *Catania v. Brown,*

4 Conn.Cir., 344, 231 A.2d 668 (App. Div. 1967); Conn.Gen.Stat.Ann. § 42a–2–315; J. White & R. Summers, Uniform Commercial Code 297 (1972). The existence of this warranty, therefore, depends in part upon the comparative knowledge and skill of the parties.

■ In the instant situation, PFC surely knew of the purpose for which the wiglet case was to be used and was skilled in the specific manufacturing process. But it cannot be said that Friedman's knowledge of the goods or the process was so inferior or his reliance on PFC's skill so great as to give rise to one of the narrow situations in which this warranty applies. Friedman had many years of experience with wig cases and other plastic products of his own design. He was familiar with both blow-molding and injection-molding. He chose the process by which the wiglet case was to be manufactured, insisted that the wiglet case conform to the shape of the wig case, and rejected suggestions made by PFC that would have increased the strength of the handle housing. These actions belie the assertion that Friedman was substantially relying on PFC to design the specifications of the case. *See Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.,* 516 F. 2d 33 (10th Cir. 1975). Friedman's decisions are analogous to a buyer's request for a product with a particular brand name. In the latter situation, Official Comments to the Uniform Commercial Code specifically preclude the implication of a warranty of fitness for a particular purpose, Conn.Gen.Stat.Ann. § 42a–2–315 Official Comment 5, because the buyer's request indicates that he is not relying on the seller's skill. *Compare Beech Aircraft Corp. v. Flexible Tubing Corp.,* 270 F.Supp. 548 (D.C. Conn. 1967).

■ Furthermore, the Code distinguishes between the ordinary purpose

---

1. The provisions of the Uniform Commercial Code relevant to the issues involved here are substantially the same in New York and Connecticut. Thus we are not presented with a choice of law problem.

for which a product is used and a "particular" purpose to which this warranty applies. Conn.Gen.Stat.Ann. § 42a–2–315 Official Comment 2. *Compare* Conn.Gen. Stat.Ann. § 42a–2–314(2)(c). A particular purpose envisages a specific use of the product which is peculiar to the buyer, Conn.Gen.Stat.Ann. § 42a–2–315 Official Comment 2, *see Wilson v. Massey-Ferguson, Inc.,* 21 Ill.App.3d 867, 315 N.E.2d 580 (1974). The wiglet cases were never intended for any purpose other than the ordinary purpose of carrying hairpieces and accessories. Thus the court finds that the warranty of fitness for a particular purpose does not apply.

 The absence of a particular purpose does not preclude the application of implied warranties of quality to a product. An implied warranty of merchantability, when applicable, acts as a guarantee by the seller that his goods are fit for the ordinary purposes for which they are to be used and will pass in the trade without objections. Conn.Gen.Stat. Ann. § 42a–2–314(2). This warranty applies only when the seller is a merchant with respect to goods of the kind involved in the dispute. PFC has contended that it was not a merchant of wiglet cases but a blow-molding equipment manufacturer and custom molder. The implication of this contention is that manufacturers who produce a variety of goods would never fall within the broad scope intended for § 42a–2–314. That contention must be rejected where unmerchantability results from defects in the production process with which the manufacturer is familiar. This conclusion is implicit in the Code's definition of "merchant":

> "Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the *practices* or goods involved in the transaction . . . (emphasis added).

Conn.Gen.Stat.Ann. § 42a–2–104(1). The term "practices" indicates that one may be a merchant of goods by virtue of his involvement in the process by which those goods are produced as well as by sale of the finished goods from inventory. Cf. *Mercanti v. Persson,* 160 Conn. 468, 280 A.2d 137 (1971). The court finds that PFC was a merchant of blow-molded products of the kind involved in this transaction. The wiglet cases produced by this process were subject to an implied warranty of merchantability.

██ ██ If, however, a buyer examines a sample or model of the goods to his full satisfaction, no implied warranty of merchantability arises with respect to defects which an examination ought to have revealed to him. Conn.Gen.Stat. Ann. § 42a–2–316(3)(b). Cf. *Micallef v. Miehle Co.,* 46 A.D.2d 790, 361 N.Y.S. 2d 25 (1974). An examination within the meaning of that statute is to be distinguished from a casual inspection. *Compare* Conn.Gen.Stat.Ann. § 42a–2–513. The scope of the exclusion obtained through a buyer's examination depends not only on the examination made, but on the examination that should have been made by the particular buyer. *See* Conn. Gen.Stat.Ann. § 42a–2–316 Official Comment 8. *See also Young & Cooper, Inc. v. Vestring,* 214 Kan. 311, 521 P.2d 281 (1974); *Valgia v. National Food Co.* 58 Wis.2d 232, 206 N.W.2d 377 (1973). In the present situation we are not confronted with a consumer who would not notice imperfect construction or defects apparent only to a trained eye. Rather the plaintiff Friedman was an informed buyer who designed the product in issue and held mechanical and design patents covering similar cases. By his own testimony Friedman examined 15 pre-production cases in September 1969 and made comments concerning defects that he perceived at that time. He inspected the handle and handle housing by lifting the cases and shaking them with no adverse effect. Had the cracking in fact resulted from a defectively thin handle housing, that weakness cannot be said to have been latent so as to have been undiscoverable during Friedman's examination. *See Parente v. Bayville Marine, Inc.,*

43 A.D.2d 956, 353 N.Y.S.2d 24 (1974). *Compare Wilson Trading Corp. v. David Ferguson, Ltd.,* 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968).

 Blockhead now contends that these examined cases had handle housings of a proper and merchantable thickness but that the production pieces that followed did not conform to the models. Specifically, Blockhead claimed at trial that the holes in the handle housings on the production pieces were improperly drilled, thus rendering the housings uselessly thin, unfit for their ordinary purpose, and incapable of passing without objection in the trade. Blockhead, however, has introduced no proof to substantiate its claim that the handle housing thickness on production pieces materially differed from the thickness on the pre-production pieces.

 The housing walls were the inevitable result of the specifications that Friedman provided and approved. Although no specifications for the handle housing were included in any of the blueprints approved by Friedman, his previous experience with blow-molding and his knowledge of the plastics industry must have or should have informed him of the effects of the process on the thickness of the handle housing given the other dimensions that he did provide. Thus, according to the very provisions under which Blockhead seeks to recover, Friedman's knowledge of the industry and approval of the specifications limits PFC's warranty liability.

Comment 9 to Conn.Gen.Stat.Ann. § 42a–2–316 provides:

> The situation in which the buyer gives precise and complete specifications to the seller is not explicitly covered in this section, but this is a frequent circumstance by which the implied warranties may be excluded. . . . Thus, where the buyer gives detailed specifications as to the goods, neither of the implied warranties as to quality will normally apply to the transaction unless consistent with the specifications.

While Friedman did not give "precise and complete specifications" to PFC concerning the handle housing, those specifications that he did either give or approve and the cost decisions that he made necessitated the production of a thin handle housing.[2] These were not decisions made out of ignorance. Friedman's approval of products manufactured according to his decisions prevent him from claiming now that PFC impliedly warranted the merchantability of his product.

 Blockhead's final warranty claim is based on alleged representations made through descriptions and models of the wiglet case and from correspondence between the parties. The Uniform Commercial Code, Conn.Gen.Stat.Ann. § 42a–2–313, provides that an express warranty is created by any description of the goods, sample or model that is made part of the basis of the bargain. The fifteen pre-production cases that Friedman inspected in September 1969 were

2. PFC did what it could to limit this effect by molding the case in an inverted position so that a maximum amount of plastic would be forced into the housing area. In order to make the housing walls of the wiglet case the same thickness as the housing walls of the wig case, however, the body walls of the wiglet case would have to be ⅜ of an inch to ½ of an inch thick and the resulting cost would have been prohibitive. Thus the court finds that a thin-walled housing such as was found here would not necessarily be objectionable in the trade of blow-molding or wiglet case manufacturing. It is useful to note that even where a product causes injury, it may still be merchantable if it would pass without objection in the trade under the contract description and conforms to other products of the trade which are on the market. *See Green v. American Tobacco Co.,* 391 F.2d 97 (5th Cir. 1968) ; *overruled en banc,* 5th Cir., 409 F.2d 1166, *cert. denied,* 397 U.S. 911, 90 S.Ct. 912, 25 L.Ed. 93 (1969) (cigarettes that conform to other products in the trade not unmerchantable despite possibility that they will cause cancer). The court finds that such conformity was present here and that Friedman was responsible for being aware of what standards the industry could achieve. Thus, if any warranty of merchantability survived Friedman's examination of the models, it could have been fully satisfied by PFC's product.

models within the Code's definition of that term [3] and would thus be an appropriate basis for an express warranty. *See Pacific Marine Schwabacher, Inc. v. Hydroswift Corp.*, Utah, 525 P.2d 615 (1974).

Blockhead's assertion that the housing walls in production pieces did not conform to pre-production models amounts to a claim of breach of this warranty. This claim fails on two counts. First, as stated above, no proof was introduced to substantiate Blockhead's claim of a variation in handle housing thickness between the model cases and production cases. Second, a variation in thickness, even if it did exist, would not necessarily constitute a breach of the warranty expressed by the sample or blueprint description. Where the express warranty is created by models not drawn from inventory, such as these pre-production cases, the presumption that the models provide a literal description of subsequent products is not particularly strong. *See* Conn.Gen.Stat. Ann. § 42a–2–313 Official Comment 6. In the final analysis, expert testimony may be required to determine whether the measurements in production pieces are close enough to those in pre-production models to satisfy the warranty created by the models. *See* J. White & R. Summers, Uniform Commercial Code 285 (1972). In the present situation, plaintiff introduced no such evidence. Even Edward Hileman, the president of Oneida, was unable to say that a paperthin plastic housing wall could not support the weight for which it was intended.

Friedman contended throughout his testimony and in much of his correspondence with PFC that around late February 1970, before he made final payment for the wiglet cases, he demanded and received a letter from Brink that guaranteed the quality of the cases. Friedman has been unable to produce this letter despite his retention of other correspondence between Blockhead and PFC. No other witness has testified to seeing such a letter.[4] The correspondence that recapitulates the settlement which led to payment by Friedman makes no mention of a guarantee. Brink has explicitly denied issuing any guarantee. Friedman's testimony about the letter is not credited, and the court finds that no such letter was sent and no such guarantee was made by PFC.

B. Breach as the Proximate Cause of Injury

Assuming *arguendo* the existence and breach of an express or implied warranty of quality, Blockhead's recovery still depends on a determination that defendant's breach proximately caused a loss to plaintiff. Blockhead's evidence indicates that the wiglet cases were manufactured with a handle housing which, in retrospect, was thin, and that the handle housings were found in November 1971 to be ruptured on a sufficient number of cases to make them unmerchantable. No witness testified that the amount of material in the handle housing was insufficient to support the expected weight of the case and its contents. The defendant company, however, was able to elicit testimony from Charles Joslin of Union Carbide, an expert witness, that a handle housing .015 of an inch thick—the approximate thickness of the housing walls in question—could adequately support the expected weight.

3. A "sample" is actually drawn from the bulk of goods which is the subject matter of the sale. A "model" is a good offered for inspection when the subject matter of the sale is not available, *e. g.*, when, as in the present situation, the goods that are the subject matter of the transaction have not been manufactured. Conn.Gen.Stat.Ann. § 42a–2–313 Official Comment 6.

4. In a deposition upon written questions that was read into the record, Friedman's secretary stated that Blockhead had received letters of guarantee from Brink. The secretary, however, appears to have been speaking of the letters involved in the January and February 1970 settlement negotiations. No warranty is to be found in those letters. There is no particular reason why the secretary would have recalled the specific letter of guarantee if it did exist. Her testimony is not credited.

PFC, moreover, injected no small degree of doubt into the proposition that the ruptured handle housings were caused by faulty manufacture or drilling rather than by some other defect. To understand fully PFC's contention, some of the evidence concerning the intricacies of plastics technology must be set forth.

Polypropylene, the material from which Oneida manufactured the handle and pedestal, has a high tendency to "creep" or "cold flow." Basically these terms mean that one plastic part will tend to adapt itself to certain dimensions when interlocked with another part. While "creeping" is endemic to all plastic products, it can be limited to a permissible level through proper processing. Conversely, molding or cooling the product at an improper temperature or pressure will aggravate the propensity to "creep." In this instance, the handles allegedly began to "creep" when inserted into the handle housing. PFC contends that the handles, which were initially intended to squeeze in on the housing, contracted around the housing over a period of months to such a degree that they broke the thin plastic wall; thus the handle produced by Oneida for Blockhead and furnished by Blockhead to PFC, and not the housing which would have withstood normal stress, proximately caused the rupture in the cases examined at Oneida in November 1971. PFC further contends that "creep" was aggravated to this degree by Oneida's improper method of manufacturing the handle. Apparently, both handles and pedestals were manufactured in the same mold, called a "family mold." The different thicknesses of these two parts, however, required that they would ideally remain in the mold for different periods of time during the manufacturing process. Realization of that ideal was impossible in this instance because both parts were produced simultaneously in the family mold. If the mold remained closed for the full period of time necessary to form the handles properly, the pedestals would have shrunk and cracked. Thus a compromise had to be found between the amount of time required properly to form the handle and the pedestal. Joslin, the expert witness, testified that Oneida, apparently in order to reach this compromise, had molded the parts at a temperature that was forty degrees below the minimum prescribed for a polypropylene handle the thickness of the one used in the wiglet case. The cooling period for the handle lasted about half the time recommended by the expert. This compromise apparently so increased the propensity of the handles to "creep" when inserted in the housing that the president of Oneida himself admitted that normally it would not have been good engineering practice to produce the diverse pieces in the same mold. In this instance, however, the family mold was used at the insistence of Friedman who perceived the tooling of a single mold for both handles and pedestals as another means of saving money.

The deformity in the handles that increased the stress on the housing may well have been enhanced by Oneida's method of altering the space between the stop ledges from 2 to 1⅞ inches when that change was made in the summer of 1969. Rather than change the distance in the family mold, as PFC changed its mold to accommodate the new handles, Oneida allowed the molded handles to shrink an additional amount during the cooling process. This method precluded Oneida from controlling the direction of movement in the handle lugs while the parts were shrinking. Ostensibly, the lugs moved out of parallel during this process and thus eventually stretched the housings to the breaking point after insertion.

■■ It is sufficient to note that PFC has introduced a plausible alternative explanation of how the injuries to the handle housings of which Blockhead complains arose. Blockhead bears the burden of demonstrating that PFC's breach of warranty proximately caused those injuries. Conn.Gen.Stat.Ann. § 42a–2–607(4). Satisfaction of that burden requires Blockhead to demonstrate that the handle housing was the *probable*

cause of the injuries. A showing that a defendant *possibly* caused the injuries is insufficient to impose liability where alternative explanations have not been disproven. *See Jakubowski v. Minnesota Mining & Mfg.*, 42 N.J. 177, 199 A.2d 826 (1964). Blockhead has neither disproven the possibility that "creep" caused the damage nor proven the probability that the housing wall was of insufficient thickness to support the intended weight. The court therefore finds that plaintiff has failed to establish by a preponderance of the evidence the proximate cause necessary to a recovery.

This disposition of the case renders it unnecessary to consider the question of damages. It should be noted, however, that plaintiff's records of expenditures were often nonexistent, incomplete, and speculative. Had the court's conclusion on the issue of liability been different, this court would have found it difficult to award any but minimal damages under Conn.Gen.Stat.Ann. §§ 42a–2–714 to –715.

The foregoing constitutes the findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).