**WORLD OF SLEEP, INC., a Colorado corporation, Plaintiff-Appellee, Cross-Appellant,**

v.

**LA–Z–BOY CHAIR COMPANY, a Michigan corporation; Defendant-Appellant, Cross-Appellee,**

Montgomery Ward & Co., an Illinois corporation; Arthur Mark Mauldin; Jeff D. Mauldin, individually and d/b/a La-Z-Boy Showcase Shoppe; Mauldin Corporation, a New Mexico corporation; Defendants-Appellees,

Thomas E. Hanson, Counterdefendant-Appellee.

Nos. 82–1694, 82–1818.

United States Court of Appeals, Tenth Circuit.

March 4, 1985.

Rehearing Denied April 9, 1985.

---

Donald B. Gentry, Denver, Colo. (Julia O. Robinson, Denver, Colo., with him on the brief), of Grant, McHendrie, Haines & Crouse, P.C., Denver, Colo., for plaintiff-appellee/cross-appellant.

Gregory L. Curtner, Detroit, Mich. (Larry J. Saylor of Miller, Canfield, Paddock & Stone, Detroit, Mich., and James E. Hautzinger of Sherman & Howard, Denver, Colo., with him on the briefs), of Miller, Canfield, Paddock & Stone, Detroit, Mich., for defendant-appellant/cross-appellee, La-Z-Boy Chair Co.

Mark Crane, Chicago, Ill. (Glen H. Kanwit and Roxane C. Busey of Hopkins & Sutter, Chicago, Ill., and John E. Walberg, Denver, Colo., with him on the briefs), of Hopkins & Sutter, Chicago, Ill., for defendant-appellee Montgomery Ward & Co.

David J. Richman and Susan M. Rogers of Coghill & Goodspeed, P.C., Denver, Colo., on the briefs for defendants-appellees Arthur Mauldin and Mauldin Corp.

Before SEYMOUR and McWILLIAMS, Circuit Judges, and BROWN, District Judge.[*]

SEYMOUR, Circuit Judge.

In this antitrust action, plaintiff World of Sleep, Inc. alleged that defendants La-Z-Boy Chair Company, Montgomery Ward & Co., and Art Mauldin d/b/a La-Z-Boy Showcase Shoppe had conspired to maintain the retail price of La-Z-Boy chairs in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1982). The district court granted summary judgment for Mauldin, finding no admissible evidence linking him to the alleged conspiracy. After a four week trial, the jury found in favor of the remaining defendants on this claim.

World of Sleep also alleged that La-Z-Boy had discriminated in its advertising allowances in violation of section 2(e) of the Robinson-Patman Act, 15 U.S.C. § 13(e) (1982). La-Z-Boy counterclaimed against World of Sleep, alleging that it had violated a provision of the Colorado Unfair Practices Act, Colo.Rev.Stat. § 6–2–105 (1973). The jury found in favor of World of Sleep on the Robinson-Patman claim and awarded damages of $40,000 against La-Z-Boy, which the trial court trebled pursuant to 15 U.S.C. 15(a) (1982). The jury found against La-Z-Boy on its counterclaim.

On appeal, World of Sleep contends that the trial court erred by refusing to submit the Sherman Act claim to the jury under the per se rule, and by granting summary judgment for Mauldin on that claim. World of Sleep further asserts that a new trial is required due to the prejudice resulting from the instructions taken as a whole, several evidentiary rulings, and the deliberate misconduct of opposing counsel. Montgomery Ward counters that the appeal is not timely, and that in any event the evidence is insufficient to establish a conspiracy involving it. La-Z-Boy also appeals, contending that it is entitled to a new trial on its state law counterclaim, that the

* Honorable Wesley E. Brown, United States District Judge for the District of Kansas, sitting by designation.

court erred in submitting the Robinson-Patman claim to the jury, and that the award of attorney fees was excessive. We affirm in part and reverse in part.

## I.

### TIMELINESS OF THE APPEAL

As an initial matter we address Montgomery Ward's argument that the appeal in this case is not timely. World of Sleep's amended complaint asserted a request for attorneys fees along with claims for monetary and injunctive relief. The trial court entered judgment on the jury verdict on February 11, 1982, but did not address the outstanding request for attorneys fees. On March 17, 1982, the court ruled on the parties' post trial motions for new trial, and directed the parties to attempt to settle the attorneys fees claim and to brief any unsettled issues. On June 3, 1982, the court entered its order awarding attorneys fees of $64,708 against defendant La-Z-Boy. La-Z-Boy filed its notice of appeal on June 4, 1982, and World of Sleep filed on July 2, 1982. These notices of appeal were filed within thirty days of the order awarding attorneys fees but not within thirty days of the order denying the motions for new trial.

In *Gurule v. Wilson*, 635 F.2d 782, 788 (10th Cir.1980), a civil rights action brought under 42 U.S.C. § 1983 (1982), this court held that a judgment on the merits is not a final order for purposes of appeal if it does not address a prior request for attorneys fees made pursuant to section 1988. In *Black Gold, Ltd. v. Rockwool Industries, Inc.*, 666 F.2d 1308, 1309 (10th Cir. 1981), we applied the *Gurule* rationale in an antitrust action and held that a decision on the merits which does not dispose of an outstanding request for attorneys fees is not final for purposes of appeal. Under these decisions, the notices of appeal were timely filed in the present case after the judgment on attorneys fees.

On March 2, 1982, however, shortly before the court denied the motions for new trial in the instant case, the Supreme Court ruled that a post-judgment application for attorneys fees is not a Rule 59(e) motion to alter or amend a judgment subject to the ten-day rule. *See White v. New Hampshire Department of Employment Security*, 455 U.S. 445, 451–52, 102 S.Ct. 1162, 1166–67, 71 L.Ed.2d 325 (1982). "[A] request for attorney's fees under § 1988 raises legal issues collateral to the main cause of action—issues to which Rule 59(e) was never intended to apply." *Id.* at 451, 102 S.Ct. at 1166 (footnote omitted). Subsequently in *Cox v. Flood*, 683 F.2d 330 (10th Cir.1982), which was rendered after the instant appeals were filed, we expressly overruled *Gurule* and *Black Gold* in light of *White*.

Montgomery Ward argues that *White* directly overruled *Gurule*, and that under the holding in *White* the March 17 ruling was a final order from which World of Sleep and La-Z-Boy failed to take timely appeals. We recently considered and rejected this argument in *EEOC v. Gaddis*, 733 F.2d 1373, 1375–76 (10th Cir.1984). We there held that *White* was a narrow opinion factually distinguishable from *Gurule*, and that *Gurule* was not overruled until we extended the rationale of *White* to it in *Cox*.

Montgomery Ward alternatively argues that *Cox* should be applied retroactively to preclude our review of the merits in this case. We considered a similar argument in *Gaddis*, 733 F.2d at 1376. Based on the analysis and authorities set out there, we decline to apply *Cox* retroactively to this case. The merits of the appeals are properly before us.

## II.

### BACKGROUND

The trial of this case consumed four weeks, and the record on appeal consists of over 3000 pages and hundreds of exhibits. Nonetheless, the pertinent background

facts, although subject to some dispute, are not complicated.[1]

World of Sleep is a closely held corporation controlled and operated by Thomas Hansen. In 1965 it began the business of retailing bedding products in Denver. World of Sleep was a high-volume price discounter and advertised extensively. In April 1974, Hansen began ordering La-Z-Boy chairs for retail sale at World of Sleep. Montgomery Ward, La-Z-Boy's largest national purchaser of chairs for resale, also retailed La-Z-Boy chairs in Denver during the relevant time.

In the summer of 1975, World of Sleep ran a series of television commercials in which it mentioned its competitor Montgomery Ward by name, comparing the La-Z-Boy prices in Ward's catalogue with its own lower prices. Montgomery Ward complained to La-Z-Boy about the ads. Hansen testified that Gary Schroeder, executive vice president of sales and marketing for La-Z-Boy, told him to stop the ads. Schroeder did not remember talking to Hansen about the television ads although he did recall being told of Montgomery Ward's complaint by his right-hand man, Robert Rall.

In March 1976, the Mauldin Corporation, a family business, opened a La-Z-Boy Showcase Shoppe in Littleton, Colorado. A "Showcase Shoppe" is an independently owned retail store which sells only La-Z-Boy products and is licensed by La-Z-Boy to use the La-Z-Boy trade name. In late March, Hansen began running a series of newspaper ads undercutting both Mauldin's Showcase Shoppe and Montgomery Ward in the price of La-Z-Boy chairs, specifically referring in the ads to the Showcase Shoppe and Montgomery Wards by name. The ads continued until August.

In late April and early May 1976, La-Z-Boy notified World of Sleep of amounts past due on its account and requested a current financial statement. Hansen did not provide one. He testified that as a matter of policy he never released that

information and that he had not provided it to La-Z-Boy when he began buying chairs. Although Hansen did not deny that World of Sleep's account with La-Z-Boy was delinquent, he testified that it was due to a mix-up in deliveries by La-Z-Boy. On May 8, 1976, La-Z-Boy notified World of Sleep that its account was being placed on credit hold. The circumstances and motivation surrounding the imposition of the credit hold are the subject of conflicting evidence.

Hansen had telephone conversations with Robert Rall of La-Z-Boy on June 16 and June 23, 1976, concerning the newspaper ads in which Hansen compared World of Sleep's prices with those of Montgomery Ward. Hansen tape recorded those conversations and the tapes were admitted into evidence. In the June 16 tape, Rall said that Montgomery Ward had complained to him about the ads. Rall also told Hansen,

*"we're all very concerned about pricing at any time—you know, and I knew, of course, I was going to hear from Montgomery Ward, but I extracted a promise from Mr. Mauldin that he'd get his prices up and keep them up,* which is illegal to even talk to him about, but I—I knew that if it carried on out there that we were all going to be in trouble, and him more than anybody else ... because he has to rely upon La-Z-Boys to keep in business, but I'd kind of like to—I'd like to get it stopped. I don't want the same situation that we had in Phoenix, which was bad—I mean—you knew—that was—there wasn't anything good about it. Schroeder was out there for four days trying to get it resolved, and seems pretty well to have everybody—you know—talking about making some money again. ... I told him I was going to call Art first and then call you, and I just—you know—I'd like to know your feeling on it. *I'd like to know if—what it needs—what needs to be done, Tom, to stop a price war—*what you want from us or what you expect from us

---

**1.** The evidence relevant to World of Sleep's claim under the Robinson-Patman Act and to La-Z-Boy's counterclaim under the Colorado Un-

fair Practices Act will be set forth separately in the sections addressing those claims.

...—or what you want done there in the area."

Rec., pl. ex. 1 (emphasis added). Later in that same conversation Rall said,

"[w]e don't want any big price wars, and I'm going to do everything I can to get it stopped. If it has to come down to being drastic about it with somebody, why, we will, but we—you know—we're kind of people that like to keep everything as smooth as possible and keep the waters calm. That's the way we all do business, but I don't want to see your business hurt, and I don't want to see La-Z-Boy's business hurt either."

*Id.* (emphasis added).

The June 23 conversation occurred following an alleged meeting between Rall and officers of Montgomery Ward. Rall indicated that Montgomery Ward was very unhappy about the ads and then stated to Hansen:

"[W]e're very much concerned about [the Montgomery Ward situation] now, Tom. We don't really know at this moment exactly what we're going to do. I presume that you know that *we have your company on a credit hold now, and— you know—we can't ship you anything. Our plan is to leave you right there until we can figure out exactly what's going to happen,* and we're very sorry that any of this is happening."

Rec., pl. ex. 3 (emphasis added).

Although the occurrence and circumstances of the alleged meeting between Rall and Montgomery Ward are matters of conflicting evidence, it is undisputed that the Denver furniture merchandiser for Montgomery Ward sent a World of Sleep ad to the national Montgomery Ward chair buyer in Chicago, Al Weissenstein. Weissenstein testified that he complained about the ad to Rall, who "said he would talk to the guy [Hansen] to ask him to try to not run Ward's ads, reproduce Ward's ads, and ... the guy said he wouldn't do it anymore." Rec., vol. XII, at 923.

Gordon Sauer, the La-Z-Boy Collection Manager during this time, testified that he initiated the decision to place World of Sleep on credit hold because of the large amounts past due. He asserted that he prepared a past due statement for World of Sleep which was given to Rall to take with him when he went to visit World of Sleep in late June 1976. World of Sleep officials testified, however, that Rall never discussed the delinquent amounts with them or attempted to reconcile the account. It was World of Sleep's position at trial that Rall had deliberately failed to get the credit situation resolved as part of the illegal conspiracy.

During the summer of 1976 World of Sleep paid up its account. Sauer testified that he considered the account ready for release from credit hold in September of that year. He further testified that under company policy, an account that had been on hold for three months or more was subject to a credit limit. Under the credit limit, World of Sleep was limited to the purchase of sixty chairs at a time. This restriction was later modified so that World of Sleep could order a carload of about 200 chairs at a time, but could not order another carload until the previous one had been paid for. World of Sleep had purchased over 4000 chairs in 1975. Hansen testified that under the restriction he was unable to obtain enough chairs to pursue his high volume-heavy advertising sales method, particularly during the 1976 Christmas season. World of Sleep ultimately stopped buying La-Z-Boy chairs in August 1977.

## III.

## THE PRICE FIXING CLAIM

Based on the above events, World of Sleep alleged that La-Z-Boy, Montgomery Ward, and Mauldin conspired to maintain the retail price of La-Z-Boy chairs in violation of the Sherman Act, and that the credit hold was imposed in an attempt to enforce this illegal agreement. After summary judgment was granted for Mauldin on this claim, the jury found in favor of Montgomery Ward and La-Z-Boy.

**1474**

### A. Summary Judgment for Mauldin

■ The district court granted Mauldin's motion for summary judgment, concluding that there was insufficient evidence admissible against Mauldin of his participation in the alleged conspiracy. In reviewing a grant of summary judgment we must view the evidence in the light most favorable to the opposing party and resolve all doubts in favor of the existence of triable issues of fact. *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.1975). Although "summary procedures should be used sparingly in complex antitrust litigation," *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), they "have a place in the antitrust field, as elsewhere," *The White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963); *see also First National Bank v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

Following extensive discovery, the only evidence offered by World of Sleep connecting Mauldin to the alleged conspiracy was the telephone conversation between Hansen and Rall on June 26, 1976, in which Rall stated that he had asked Mauldin to keep his prices up and that Mauldin had said he would do so. World of Sleep also represented to the court that it would present at trial the results of surveys showing that Mauldin's advertising became less price oriented after this phone call and that Mauldin and World of Sleep both sold the same chair models. The court ruled that the taped statements by Rall relating his conversation with Mauldin were hearsay as to Mauldin. The court found that these statements were not admissible against Mauldin under Fed.R.Evid. 801(d)(2)(E) because the survey results would not constitute sufficient independent evidence of a conspiracy involving Mauldin. We agree.

■ Under Fed.R.Civ.P. 56(e), the court may consider only admissible evidence in ruling on a motion for summary judgment. "[A]cts and declarations of one co-conspirator are admissible against another if the *existence* of a conspiracy is in fact first established by independent evidence." *United States v. Andrews*, 585 F.2d 961, 964 (10th Cir.1978).

"[U]nder Rule 104 of the Federal Rules of Evidence, [a trial judge] must determine, prior to admission of the hearsay statement, as a factual matter, that the [party seeking admission] has shown by independent evidence that it is more likely than not that (1) the conspiracy existed; (2) the declarant and the defendant against whom the conspirator's statement is offered were members of the conspiracy; and (3) the statement was made during the course of and in furtherance of the objects of the conspiracy."

*United States v. Petersen*, 611 F.2d 1313, 1330 (10th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980). The independent evidence rule "is not limited to criminal cases, but applies to civil cases as well." *Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1267 (9th Cir. 1983), *cert. dismissed*, — U.S. —, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983).

When the determination is made at the initial stage of the proceedings, as here, the conspiracy must be shown by substantial independent evidence. We have defined substantial independent evidence as more than a mere scintilla, and such evidence as a reasonable mind would accept as adequate to support a conclusion. *Petersen*, 611 F.2d at 1330 n. 1.

■ Under this standard, we concur with the district court's determination that the proposed surveys did not constitute sufficient independent evidence to establish Mauldin's participation in a price fixing conspiracy, and that the hearsay statements therefore were not admissible against him. We accordingly affirm the summary judgment in favor of Mauldin.

### B. Conspiracy Evidence With Respect To Montgomery Ward

Montgomery Ward contends that the trial court erred in denying its motion for

directed verdict because the record contains insufficient admissible evidence of its participation in the alleged price fixing conspiracy. While this appeal was pending, the Supreme Court specifically addressed the quantum of conspiracy evidence required to raise a jury issue when a plaintiff dealer alleges that he was terminated by a manufacturer pursuant to a vertical agreement to maintain resale prices. *See Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Although the Court in *Monsanto* was concerned with conspiracy evidence sufficient to avoid a directed verdict for a defendant manufacturer, rather than a defendant dealer-competitor such as Montgomery Ward, the analysis in *Monsanto* governs our resolution of Montgomery Ward's argument. The issue before us requires that we integrate the standards of *Monsanto* with the rule, discussed above in Part III A, that a co-conspirator's hearsay statements are inadmissible against a defendant absent independent evidence of a conspiracy involving that defendant.

In *Monsanto* the Court held that a jury may not be permitted to infer an agreement "merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints," *id.* 104 S.Ct. at 1470, because this evidence, without more, does not indicate concerted action. The Court noted that although evidence of complaints does have some probative value, "the burden remains on the antitrust plaintiff to introduce additional evidence sufficient to support a finding of an unlawful contract, combination, or conspiracy," *id.* 104 S.Ct. at 1471 n. 8, and "that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." *Id.* 104 S.Ct. at 1471. "[E]vidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Id.* 104 S.Ct. at n. 9.

■ Here the district judge held extensive pretrial hearings to determine whether the taped telephone conversations were ad-

missible against Montgomery Ward, and concluded that sufficient independent evidence existed of a conspiracy between La-Z-Boy and Montgomery Ward to admit the tapes under Fed.R.Evid. 801(d)(2)(E). With the benefit of *Monsanto*, we must disagree. If Montgomery Ward independently set its own prices, and if La-Z-Boy unilaterally decided to terminate World of Sleep for refusing to keep its prices up, no conspiracy existed between Montgomery Ward and La-Z-Boy. The only independent evidence of a conspiracy between them is precisely that which was held to be insufficient to raise a conspiracy fact issue in *Monsanto*—complaints by a dealer who competes with the price cutting plaintiff, and action in response by the manufacturer adverse to the price cutter. Under *Monsanto* this evidence does not tend to exclude the possibility that La-Z-Boy and Montgomery Ward were acting independently. World of Sleep presented no other evidence that La-Z-Boy sought and received Montgomery Ward's agreement to maintain resale prices, or that Montgomery Ward sought and received La-Z-Boy's agreement to coerce other dealers to keep their prices up.

We conclude that the record contains insufficient independent evidence of Montgomery Ward's participation in the alleged conspiracy to permit the admission of co-conspirator's hearsay statements, *see Filco*, 709 F.2d at 1267, and that the independent evidence, standing alone, was not enough to allow this issue to go to the jury. For this reason, we affirm the judgment for Montgomery Ward on the Sherman Act claim.

### C. Conspiracy Evidence Against La-Z-Boy

■ We reach a different conclusion with respect to La-Z-Boy. A buyer who contends that a seller has taken action adverse to him as a means of enforcing price fixing may establish the requisite conspiracy by showing that although he refused to acquiesce in the price fixing, other buyers agreed to the arrangement. *See Black Gold, Ltd. v. Rockwool Industries, Inc.,*

729 F.2d 676, 685–86 (10th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984); *see also Black Gold, Ltd. v. Rockwool Industries, Inc.,* 732 F.2d 779 (10th Cir.1984) (opinion on rehearing). The evidence shows that Montgomery Ward complained to La-Z-Boy about World of Sleep's ads, and that La-Z-Boy thereafter tried to convince World of Sleep to stop its price war. The taped telephone conversations are evidence that La-Z-Boy, through its agent Robert Rall, sought and received Mauldin's agreement to keep his prices up.[2] The tapes and other evidence support a reasonable inference that Rall attempted to coerce World of Sleep's president, Hansen, into agreeing to keep his prices up by using the credit hold and subsequent purchase restrictions as "a lever to force compliance." *Monsanto,* 104 S.Ct. at 1471 n. 10. This evidence raises a fact issue as to whether a conspiracy existed involving La-Z-Boy and Mauldin, and is sufficient to send the Sherman Act claim against La-Z-Boy to the jury. *See id.* 104 S.Ct. at 1471–72.

### D. *The Requested Per Se Instruction*

The district court instructed the jury to evaluate World of Sleep's Sherman Act claim under the rule of reason. Given our conclusion that the record contains sufficient admissible evidence of a conspiracy involving La-Z-Boy to create a jury issue, we must determine whether the trial court erred in holding that the Sherman Act claim was not subject to the per se rule.

The factual, legal, and economic considerations relevant to an alleged vertical conspiracy to maintain resale prices are troublesome and have been the subject of considerable litigation and commentary. In *Continental T.V., Inc. v. GTE Sylvania,* 433 U.S. 36, 58, 97 S.Ct. 2549, 2561, 53

L.Ed.2d 568 (1977), the Supreme Court overruled *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), and held that nonprice vertical restraints are not illegal per se but are to be judged under the rule of reason. Both before and after the *Sylvania* decision arguments have been offered in favor of abandoning the per se rule with respect to vertical price restraints as well. *See, e.g., Sylvania,* 433 U.S. at 69–70, 97 S.Ct. at 2567–68 (White, J., concurring in the judgment); *Monsanto,* 104 S.Ct. at 1469 n. 7; A.B.A. Antitrust Section, Monograph No. 2, Vertical Restrictions Limiting Intraband Competition 77–96 (1977). However, in *Monsanto* the Court declined to alter the rule that vertical agreements to fix prices remain illegal per se. *See* 104 S.Ct. at 1469; *see also Sylvania,* 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18.

La-Z-Boy argued to the trial court that there can be no per se illegal price fixing in a vertical context without an announced fixed resale price and adherence to that announced price. La-Z-Boy convinced the court that to be subject to the per se rule, the vertical agreement must be to maintain a specific price rather than merely to keep prices up. La-Z-Boy argues on appeal that coercion to maintain price levels, which would be illegal per se in a horizontal agreement, is not per se illegal when the conspiracy is vertical. We are not persuaded.

The Supreme Court has proscribed vertical price fixing conspiracies as illegal per se because such agreements deprive dealers of the ability to exercise their own judgment in "making independent pricing decisions." *Monsanto,* 104 S.Ct. at 1470; *Albrecht v. Herald Co.,* 390 U.S. 145, 152–

---

**2.** Although the tapes are inadmissible as to Mauldin under the co-conspirator's hearsay rule, we agree with the district court that the tapes are admissible against La-Z-Boy under Fed.R.Evid. 801(d)(2)(E) as an admission by a party. The conclusion that the tapes were inadmissible as to Mauldin was not a conclusion that Mauldin and La-Z-Boy had not conspired, and the trial judge so stated. In an action

against La-Z-Boy, therefore, La-Z-Boy can still be accused of conspiring with Mauldin. *See, e.g., United States v. Sangmeister,* 685 F.2d 1124, 1126–27 (9th Cir.1982); *United States v. Coppola,* 526 F.2d 764, 776 (10th Cir.1975); *cf. United States v. Hopkinson,* 631 F.2d 665, 668 (10th Cir.1980), *cert. denied,* 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 620 (1981).

53, 88 S.Ct. 869, 873–74, 19 L.Ed.2d 998 (1968); *see also Simpson v. Union Oil Co.,* 377 U.S. 13, 20–21, 84 S.Ct. 1051, 1056–57, 12 L.Ed.2d 98 (1964); *cf. United States v. Parke, Davis & Co.,* 362 U.S. 29, 45–47, 80 S.Ct. 503, 512–13, 4 L.Ed.2d 505 (1960). In condemning vertical price restraints, the Court has often cited the description of price fixing set out in *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940), a case involving a horizontal price fixing conspiracy. *See, e.g., Simpson,* 377 U.S. at 18, 84 S.Ct. at 1055; *Parke, Davis,* 362 U.S. at 47, 80 S.Ct. at 513; *see also Albrecht,* 390 U.S. at 151, 88 S.Ct. at 872. *Socony-Vacuum* states that "[u]nder the Sherman Act a combination formed for the purpose and with the *effect of raising,* depressing, fixing, pegging, *or stabilizing* the price of a commodity in interstate or foreign commerce is illegal per se." *Socony-Vacuum,* 310 U.S. at 223, 60 S.Ct. at 844 (emphasis added).

 Given the Supreme Court's adoption in vertical cases of a price fixing definition requiring only that prices be raised or stabilized, we reject La-Z-Boy's argument that a vertical conspiracy which maintains resale prices without setting a fixed price is not illegal per se.[3] The relevant consideration is not whether a specific price is set, but whether a dealer's independent judgment is eliminated through a coerced agreement. *See id.* at 221–22, 60 S.Ct. at 843–44; *AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.,* 705 F.2d 1203, 1205–06 (10th Cir.1982), *cert. denied,* 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983). In this case, World of Sleep contends that La-Z-Boy successfully pressured Mauldin to agree to keep his prices above the level he would have set in response to World of Sleep's competition. There is evi-

dence in the record that La-Z-Boy was in a position to exert pressure over Mauldin, who carried only La-Z-Boy products. We conclude that the jury should have been instructed that such an agreement, if proven, is illegal per se. Accordingly, we reverse and remand for a new trial on World of Sleep's Sherman Act claim against La-Z-Boy.

### E. *Lost Profits from Licensee Sales*

In 1977, after the events giving rise to this lawsuit, World of Sleep entered into licensing arrangements with four stores in the Denver area. Two of the stores were controlled by World of Sleep officers, and two were independently owned although apparently closely connected to World of Sleep. World of Sleep sold merchandise to these stores at a profit, and provided them warehouse facilities and advertising. At trial, World of Sleep sought to recover as damages the lost profits it would have realized on sales of La-Z-Boy chairs to its licensee stores had it still been dealing with La-Z-Boy. The district court refused to allow these lost profits as an element of damages, ruling under Fed.R.Evid. 403 that they would cause undue confusion and delay; and that they were too speculative.

 Damages are awarded to an antitrust plaintiff under Section 4 of the Clayton Act, which provides in pertinent part:

"[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall· recover threefold the damages by him sustained, and

---

**3.** We have examined the authorities cited by La-Z-Boy to support its theory and find that they are factually distinguishable. These cases do not even address the distinction which La-Z-Boy contends is dispositive here. They are concerned instead with *nonprice* restraints, *see, e.g., Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir.1981); *Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 638 F.2d 15, 16 (4th Cir.),

*cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981), or the evidence necessary to establish a coerced agreement, *see, e.g., H.L. Moore Drug Exchange v. Eli Lilly & Co.,* 662 F.2d 935, 945 (2d Cir.1981), *cert. denied* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 110–16 (3d Cir.1980), *cert. denied* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

the cost of suit, including a reasonable attorney's fee."

15 U.S.C. § 15(a). Under this Act, a plaintiff seeking to recover lost profits that he would have made if he had not been prevented from doing so by the defendant's illegal conduct must prove an antitrust violation, the fact of damage or injury, and measurable damages. *Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 206, 209 (3d Cir.1983). To establish the fact of injury, a plaintiff must show "a causal connection between the defendant's actions violative of the Sherman Act and the actual injury to the plaintiff's business." *King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1156 (10th Cir.1981), *cert. denied*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982).

■ The Supreme Court has directed us to

"observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.' "

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129 (1969) (citations omitted) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). Thus, a plaintiff's burden to show injury in fact "is satisfied by its proof of *some* damage flowing from the unlawful conspiracy," *id.* 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9, which may be established by reasonable inferences drawn from circumstantial evidence, *id.* at 125, 89 S.Ct. at 1577.

■ If the plaintiff has demonstrated some damage, the actual amount need not be proven to the same degree of certainty. *King & King*, 657 F.2d at 1158. "[A] plaintiff is not to be held to a rigid standard of proof regarding the amount of damages, since in such cases economic harm is frequently intangible and difficult to quantify." *Id.* at 1157.

"[W]hile the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).

■ The trial judge in this case concluded that World of Sleep's lost profits from potential sales to the licensee stores were too speculative because "there is no history at all of any profit or loss on these dealings during the years involved in this case ... [and] no evidence that La-Z-Boy would have consented to such an operation." Rec., vol. XII, at 787. The court also concluded that World of Sleep had failed to supply sufficient evidence of the expenses involved in this business to show that any profit would have been realized.

Under the standards for proof of antitrust damages set out above, we must conclude that the court's decision to exclude proof of this element of damages cannot be sustained. If proof of a profit and loss history were required, no plaintiff could ever recover for losses resulting from his inability to enter a market. However, such recoveries are clearly available under section 4 of the Clayton Act. *See, e.g., Zenith*, 395 U.S. at 129, 89 S.Ct. at 1579. Here, plaintiff proffered evidence that all four Denver licensee stores bought almost all

their merchandise from World of Sleep, and that World of Sleep sold La-Z-Boy chairs to other licensee stores outside the Denver area during the existence of the alleged conspiracy.[4] World of Sleep also proffered evidence through its expert of the method by which the potential profits could be calculated. Other evidence at trial tended to prove the unique character of La-Z-Boy chairs and World of Sleep's inability to replace that brand with another equally effective seller. World of Sleep also demonstrated the value of selling a recognized name brand. This evidence is sufficient to permit a reasonable inference of injury in fact, and to afford a rational basis for inferring an approximate amount of damages. On retrial of the Sherman Act claim against La-Z-Boy, World of Sleep may thus present evidence relevant to this element of damages.[5]

### IV.

### THE ROBINSON–PATMAN CLAIM

La-Z-Boy originally manufactured one line of chairs, the Charter line, which was purchased primarily by furniture stores. Prior to the events at issue here, La-Z-Boy created a second line, the Americana line, which was developed for sale to department stores. The evidence at trial tended to prove that the differences between the two lines, if any, were at most cosmetic. Because department stores allegedly preferred to do their own advertising, La-Z-Boy established a promotional allowance

which it offered on each Americana chair. The allowance ranged over time from $2.25 to $3.00 per chair. La-Z-Boy offered only advertising aids to the furniture stores retailing the Charter line. World of Sleep carried the Charter retailing the Charter line. World of Sleep carried the Charter line and did not obtain an advertising allowance on most of the chairs it purchased. Montgomery Ward carried the Americana line and did receive the allowance.

World of Sleep claimed that La-Z-Boy violated section 2(e)[6] of the Robinson-Patman Act, 15 U.S.C. § 13(e), by failing to provide it the same allowance offered to Montgomery Ward. The jury returned a verdict for World of Sleep on the claim and awarded damages of $40,000. La-Z-Boy argues on appeal that this claim should not have gone to the jury because World of Sleep offered no evidence that it suffered actual injury as required to recover damages under section 4 of the Clayton Act, 15 U.S.C. § 15.

■ To recover damages for a Robinson-Patman violation under section 4 of the Clayton Act, "a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981). As we discuss above in Part III E, a plaintiff must show that he suffered actual antitrust injury as a result of the violation—he must prove injury in fact.

---

**4.** We thus disagree with the district court's conclusion that World of Sleep failed to make an adequate showing that La-Z-Boy would have consented to the potential sales at issue here. We note that there is one reference in the record to La-Z-Boy's potential disapproval of transshipping, but only with respect to shipments made to dealers outside the Denver area. Any factual dispute on this issue is one for the jury to resolve.

**5.** In view of our resolution of this issue, we conclude that, on retrial, Fed.R.Evid. 403 would not bar admission of noncumulative evidence of this proper element of damages. We also note that the issues on retrial have been reduced considerably by our resolution of the arguments raised on appeal.

**6.** We note that World of Sleep's claim should properly have been asserted under section 2(d) rather than 2(e). World of Sleep claims that La-Z-Boy illegally gave an allowance to Montgomery Ward. "Section 2(d) applies when the *seller pays the buyer*, or grants him a price allowance, for promotional services to be rendered by the buyer; Section 2(e), on the other hand, applies when a *seller performs* the promotional service for the buyer." 5 J. von Kalinowski, Antitrust Laws and Trade Regulation § 34.-01[2], at 34–10 to –11 (1984) (footnotes omitted). This error does not affect our analysis because these two sections have been interpreted almost identically. *Id.* 34.02.

In *J. Truett Payne* the Supreme Court rejected the "automatic damages" rule with respect to section 2(a) violations,[7] and concluded that the requisite injury and damages cannot be presumed from a show-ing of illegal discrimination alone. 451 U.S. at 563, 101 S.Ct. at 1927. That hold-ing is equally applicable to a plaintiff seek-ing damages for a violation of section 2(e) because such damages are also governed by section 4 of the Clayton Act, the dam-ages provision construed in *J. Truett Payne*. Under the Supreme Court's analy-sis, a plaintiff must show more than that he failed to receive a promotion allowance. He must show that this disadvantage ad-versely affected his ability to compete with favored competitors, because this is the competitive injury the Robinson-Patman Act was intended to prevent. *See id.* at 563–64 & n. 4, 101 S.Ct. at 1927–28 & n. 4. Such a showing may be made by proof that the illegal discrimination permitted a fa-vored purchaser to lower its prices and thereby reduce a plaintiff's sales or profits. *Id.* at n. 4. A disfavored buyer might also show that as a result of paying more for its goods than its competitors, it was less able to "advertise, make capital expenditures, and the like." *Id.*

■ The record in this case contains no evidence that World of Sleep's ability to compete with favored purchasers of La-Z-Boy chairs was in any way impeded by its failure to receive the advertising allowance. A World of Sleep official, Ted Koch, testi-fied that his company had a "dramatic suc-cess story" with La-Z-Boy chairs, rec., vol. XV, at 1459, and had "a very pleasurable experience with the La-Z-Boy line by hav-ing a dramatic surge in sales of a product that we heretofore had not carried." *Id.* at 1460. Indeed, the record indicates that World of Sleep became the second largest independent retailer of La-Z-Boy chairs in the country and came close to being the largest. Koch also agreed that World of Sleep's advertising was effective to draw

customers. Hansen himself testified that World of Sleep's "advertising on La-Z-Boy was quite successful. We were advertising a lot and it was doing a good job for us." Rec., vol. XXII, at 2907. World of Sleep presented no evidence that the allowance enabled favored competitors to lower their prices and divert sales, or that it had to lower its prices to an unprofitable level in response to such low prices. There is no evidence that the higher price World of Sleep paid for La-Z-Boy chairs had any other adverse impact on its activity in the marketplace. Indeed, World of Sleep's po-sition at trial was that, under its method of retailing, its ability to obtain a sufficient *volume* of merchandise was the critical fac-tor in its competitive position.

Although World of Sleep presented evi-dence that it paid more for La-Z-Boy chairs than did competitors who received the ad-vertising allowance, this showing is not enough to establish injury in fact under the analysis in *J. Truett Payne*. In view of the complete absence of record evidence that the alleged Robinson-Patman discrimina-tion had any detrimental effect on World of Sleep's ability to do business, its damage claim for this violation should not have gone to the jury. We therefore must re-verse the award of damages under the Robinson-Patman Act.

## V.

### THE STATE LAW CLAIM

■ La-Z-Boy counterclaimed for dam-ages against World of Sleep under the Col-orado Unfair Practices Act, alleging that World of Sleep unlawfully sold La-Z-Boy chairs below cost. The jury found in favor of World of Sleep. On appeal, La-Z-Boy contends that it should have been granted a new trial on this claim because the verdict was against the weight of the evidence. We disagree.

Colorado law prohibits a vendor from selling below cost, as defined by statute,

---

7. Section 2(a) of the Robinson-Patman Act pro-vides in pertinent part it "shall be unlawful for any person engaged in commerce ... to dis-criminate in price between different purchasers of commodities of like grade and quality...." 15 U.S.C. § 13(a).

unless such a sale is made in good faith to meet competition. Colo.Rev.Stat. §§ 6–2–105, 6–2–110 (1973). A person injured by an illegal sale below cost may recover three times the amount of actual damages sustained. *Id.* § 6–2–111.

 Denial of a motion for new trial alleging insufficient evidence will not be. reversed unless the moving party has "demonstrated that the verdict was clearly or overwhelmingly against the weight of the evidence." *Prebble v. Brodrick,* 535 F.2d 605, 617 (10th Cir.1976). In this case, World of Sleep presented evidence at trial adequaste to support the jury verdict in its favor.

## VI.

### CONCLUSION

We need not consider in detail the remaining allegations of error. In view of our disposition of the Robinson-Patman claim, the award of attorneys fees to World of Sleep for the Robinson-Patman violation must be reversed. If an award of fees is appropriate after retrial, it should be made under the guidelines set out in *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983).[8] We share the district judge's dismay over the failure of La-Z-Boy's counsel to abide by the court's rulings during trial; however, we need not determine whether such conduct was prejudicial and we presume it will not recur. We have examined World of Sleep's argument with respect to the jury instructions and conclude that, except for the court's failure to give a per se instruction as discussed in Part III C above, World of Sleep's allegations of reversible error are without merit.

Accordingly, we affirm the judgment for Mauldin and Montgomery Ward on the Sherman Act claim. We reverse the judgment for La-Z-Boy on this claim and remand for a new trial in light of this opinion. We reverse the judgment and award of damages and attorney fees in favor of

World of Sleep on the Robinson-Patman claim. Finally, we affirm the judgment in favor of World of Sleep on the claim under the Colorado Unfair Practices Act.

Affirmed in part, reversed in part, and remanded for further proceedings.

---

**8.** Although *Ramos* addresses an award of fees under 42 U.S.C. § 1988 (1982), the same standards govern an award of fees under the federal antitrust laws. *See Hensley v. Eckerhart,* 461 U.S. 424, 430 n. 4, 103 S.Ct. 1933, 1938 n. 4, 76 L.Ed.2d 40 (1983).